# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-51024

United States Court of Appeals
Fifth Circuit

**FILED**
February 19, 2021

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

     Plaintiff - Appellee

v.

OJIN KIM,

     Defendant - Appellant

---

Appeal from the United States District Court
for the Western District of Texas

---

Before DENNIS, SOUTHWICK, and HO, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

Defendant Ojin Kim pleaded guilty, pursuant to a plea agreement, to one count of criminal copyright infringement, 17 U.S.C. § 506(a)(1)(A) and 18 U.S.C. § 2319(b)(1).  The district court sentenced Kim to 46 months' imprisonment and ordered him to pay $606,250 in restitution to the copyright owner, Scientific Games Corporation.  On appeal, Kim seeks to vacate the order of restitution, contending that it is in excess of the statutory maximum because it exceeds the amount of the victim's actual loss. We agree, and therefore we VACATE the restitution order and REMAND to the district court for redetermination of restitution.  On the other hand, we DISMISS Kim's

challenge to the imposition of a sentencing enhancement because it is barred by his appeal waiver.

## I. Facts and Procedural Background

The Odessa Police Department and the Ector County Sheriff's Office, in conjunction with the FBI, investigated illegal game rooms in Odessa, Texas that were the source of numerous complaints of crime and violence in the area. The FBI's investigation focused on the distributors of counterfeit gaming software. Pursuant to this investigation, Odessa officers and FBI agents executed a search warrant at OK Marketing Game Room in Odessa in February 2016. The game room contained several "Life of Luxury" ("LOL") video slot machine games. The LOL game machines contained motherboards, which include memory chips that hold the software for the games. Scientific Games Corporation is a legitimate business that produces and sells LOL game machines and owns the copyright to LOL software stored on the motherboard of each LOL machine. The computer motherboards seized from OK Marketing Game Room were found to contain memory chips with counterfeit Scientific Games labels, which indicated infringing copies of the gaming software in violation of federal copyright laws.

During the search, officers also located an empty box with a return address from Ozz Microsystem—located on Kinghurst Street in Houston, Texas—a company eventually connected to Ojin Kim. A Confidential Human Source (CHS) knowledgeable in game room operations and gaming equipment purchased 24 counterfeit LOL motherboards from Ojin Kim and his co-defendant, Hans Kim.

In July 2016, the Ector County Sheriff's Office executed a search warrant at a different game room in Odessa, the Best/Blue, and seized the motherboard from each gaming machine at that location, many of which were LOL motherboards. The owner of Best/Blue, Ok Cha Muraki, told the deputies that

No. 18-51024

she purchased motherboards from Kim. Muraki said that Kim told her that the motherboards had been made in China, which explained why they were sold cheaply for only $300–$400 each. Muraki further reportedly stated that she owed Kim more than $200,000 for prior purchases of gaming equipment, including motherboards. On November 21, 2016, the FBI seized ten LOL motherboards from the Ozz offices in Houston. On the same day, the FBI interviewed Kim, who admitted that he knowingly sold counterfeit copies of LOL software.

Kim pleaded guilty to one count of criminal copyright infringement. In the factual basis of his plea agreement, Kim agreed that he caused a financial loss to Scientific Games of $30,000, which was calculated by multiplying 24, the number of counterfeit LOL motherboards that the CHS purchased from Kim, by the retail value of $1,250 per motherboard. Kim also agreed to pay restitution to "include all amounts discovered through investigation into his criminal activity as described and set out in the Indictment." Additionally, Kim's plea agreement stated:

> The Defendant waives the right to appeal any aspect of the conviction and sentence, and waives the right to seek collateral relief in post-conviction proceedings, including proceedings under 28 U.S.C. § 2255. This waiver does not apply to ineffective assistance of counsel or prosecutorial misconduct of constitutional dimension of which the Defendant did not have knowledge at the time of sentencing.

The presentence report (PSR) stated that Kim was accountable for the sale of 485 counterfeit motherboards for a total loss of $606,250. The probation office arrived at this figure through two separate calculations. First, mirroring the plea agreement, the PSR stated that Kim was accountable for a loss of $30,000 based on the counterfeit motherboards he sold to the CHS. This calculation multiplied the approximate retail value of a LOL motherboard, $1,250, by 24, the number of motherboards purchased by the CHS from Kim

and his co-defendant. Second, the PSR stated that Kim was responsible for the sale of an additional 461 counterfeit motherboards for a loss of $576,250. To arrive at this number, the probation office relied on the statement by Muraki, owner of the Best/Blue game room, that she owed Kim $200,000. The PSR stated that this $200,000 "could have bought 461 motherboards at an average cost of $434 each." The PSR then multiplied the approximate retail value of a LOL motherboard, $1,250, by 461 to arrive at the alleged loss to Scientific Games of $576,250. It is this calculation that Kim challenged in the district court and on appeal.

These calculations impacted facets of both Kim's recommended sentence of imprisonment and the amount he owed in restitution. First, because the loss amount exceeded $550,000, the PSR applied a 14-level sentencing enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(H), resulting in a Guideline range of 46 to 57 months. Second, the PSR concluded that Kim owed Scientific Games restitution of $606,250. Because Scientific Games owns the copyright to LOL, the PSR identified it as the "victim" of Kim's criminal copyright infringement for purposes of restitution.

While Kim agreed he owed restitution of $30,000 to Scientific Games based on the 24 motherboards that the CHS purchased from Kim and his co-defendant, he objected to the additional $576,250 in calculated loss based on the statements of Best/Blue game room owner Muraki. In his objections to the PSR, Kim argued that Muraki did not purchase the gaming boards from him, but instead that Muraki purchased the Best/Blue game room with the gaming machines already in place. He also stated that the sales he made to the Best/Blue "were for bill acceptors, monitors, power supplies, wiring, and spare parts, not motherboards." Finally, Kim argued that Muraki did not owe him $200,000—for motherboards or anything else—because Kim had required cash on delivery.

No. 18-51024

At sentencing, Kim reiterated his objection to the total loss and restitution calculations, again asserting that Muraki did not owe him $200,000 and that he did not sell her counterfeit motherboards; rather, he insisted that he only sold her other equipment and cabinets. In support of these assertions, Kim submitted an affidavit from Muraki in which she stated that because she purchased the game room from another individual, it was already stocked with games and their motherboards. She further stated she did not purchase motherboards from Kim and did not owe him $200,000 because she always paid in cash on delivery. Kim also submitted the affidavit of Ju Kim, a technician who worked for Muraki, that confirmed Muraki's statements that she did not purchase motherboards from Kim and did not owe him any money.

The Government called FBI special agent Rick Drebenstedt to testify at sentencing. Drebenstedt testified that he had interviewed Muraki about a month after he searched her game room and that during the interview Muraki told him that "she had gotten equipment or supplies from Ojin Kim in Houston, Texas" and "[t]hat during the course of transactions with [Kim], that [Muraki] had received equipment and motherboards, and that [Muraki] owed an outstanding debt of $200,000 to [Kim]." Drebenstedt further testified that the motherboards from the 103 gaming machines that were seized from the Best/Blue game room "were purchased from Ojin Kim in Houston, Texas," and that the large majority of those were Life of Luxury machines. On cross examination, Drebenstedt admitted that he did not know how many of the 103 confiscated motherboards were LOL motherboards, and that he had no documentation to indicate that Muraki owed Kim $200,000 for prior purchases. He also stated that Muraki never specified how many motherboards she purchased from Kim or what portion of the $200,000 she owed was for motherboards or for other equipment.

No. 18-51024

The district court denied Kim's objections to the total loss and restitution amounts without explanation. Kim requested a downward variance based on the nature and circumstances of the offense, arguing that the guidelines overstated the seriousness of the offense. The district court denied Kim's variance motion and stated that, based on the 18 U.S.C. § 3553(a) factors, the guidelines range was reasonable. The court sentenced Kim to 46 months in prison and three years of supervised release. The court further found that Kim owed restitution of $606,250.

On appeal, Kim challenges the district court's conclusion that he was responsible for the additional $576,250 in losses, asserting that this calculation was based on speculation—i.e., the supposed amount of counterfeit LOL motherboards that Muraki *could have* purchased from Kim at a discounted price, based on Muraki's statement that she owed Kim $200,000, if it was assumed that the entire amount was spent on counterfeit LOL motherboards. Kim argues that the deficient loss calculation warrants reversal on two points of prejudice to him: First, he argues that the district court erred in imposing a 14-level sentencing enhancement under § 2B1.1(b)(1)(H) based on its conclusion that the loss calculation exceeded $550,000. Second, he argues that his restitution order exceeds the statutory maximum because the Government failed to prove the requisite proximate cause between the victim's losses and the restitution amount. We discuss each in turn.

## II. Appeal Waiver & Sentencing Enhancement

First, Kim argues that the district court erred in imposing a 14-level sentencing enhancement under § 2B1.1(b)(1)(H) based on its conclusion that the loss calculation exceeded $550,000. The Government responds that Kim's appeal waiver bars this challenge. We agree.

"[A] defendant may, as part of a valid plea agreement, waive his statutory right to appeal his sentence." *United States v. Melancon*, 972 F.2d

566, 568 (5th Cir. 1992). "This court reviews de novo whether an appeal waiver bars an appeal." *United States v. Keele*, 755 F.3d 752, 754 (5th Cir. 2014). We conduct a two-step inquiry in determining whether an appeal waiver bars an appeal:  First, we evaluate "whether the waiver was knowing and voluntary," and second, we determine "whether the waiver applies to the circumstances at hand, based on the plain language of the agreement." *United States v. Bond*, 414 F.3d 542, 544 (5th Cir. 2005). "In determining whether a waiver applies, this court employs ordinary principles of contract interpretation, construing waivers narrowly and against the Government." *Keele,* 755 F.3d at 754 (citing *United States v. Palmer*, 456 F.3d 484, 488 (5th Cir. 2006)).

Because Kim does not contend that his appeal waiver was not knowing and voluntary, we must determine whether the appeal waiver applies to the circumstances at hand. *See Bond*, 414 F.3d at 544. Kim's plea agreement contained a broad waiver-of-appeal provision, expressly excepting only ineffective assistance of counsel claims and certain prosecutorial misconduct claims. Kim does not invoke either of these exceptions, instead arguing that his sentence exceeds the statutory maximum because the loss amount was based on speculation regarding the number of motherboards that Muraki could have purchased with the $200,000 that she initially said she owed Kim but later denied owing him. Kim contends that an argument that a sentence exceeds the statutory maximum is unwaiveable and therefore survives the appeal waiver.

Affording the language of the appeal waiver its plain meaning, it applies to the circumstances of this claim. Even if a claim that the sentence exceeds the statutory maximum is not barred by the appeal waiver, that particular claim is not implicated here:  Kim's claim is a challenge to the application of the Guidelines provision that enhanced his sentence based on a calculated loss amount exceeding $550,000, which is barred by the waiver provision, not a

claim that his sentence exceeds the maximum allowable statutory term of imprisonment. *See Bond*, 414 F.3d at 545–46; *see also United States v. Minano*, 872 F.3d 636, 636–37 (5th Cir. 2017) (determining that a challenge to the loss amount was barred by an appeal waiver because the challenge pertained to the application of a specific guideline).

### III.  Appeal Waiver & Restitution Order

Kim next challenges the amount of restitution awarded to Scientific Games.   He argues that because the restitution amount was based on speculation as to the number of motherboards that Muraki might have purchased from Ozz, the Government failed to prove the requisite proximate cause and that therefore his restitution order exceeds the statutory maximum. The Government again argues that this appeal is barred by Kim's appeal waiver.   Kim responds that he is permitted to appeal the restitution order regardless of whether he expressly reserved the right to bring such an appeal because the restitution amount exceeds the maximum authorized by statute.

The Mandatory Victims Restitution Act of 1996 (MVRA), 18 U.S.C. § 3663A, requires the payment of restitution to victims of certain offenses, including offenses committed by fraud or deceit, "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." § 3663A(a)(1), (c)(1)(A)(ii), (c)(1)(B).   Under the MVRA, a victim is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."   § 3663A(a)(2).   "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence.   The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."   § 3664(e).   "[I]f a court orders a defendant to pay restitution . . . without determining that the defendant's conduct proximately caused the victim's claimed losses, the amount of restitution necessarily

exceeds the statutory maximum." *United States v. Winchel*, 896 F.3d 387, 389 (5th Cir. 2018).

This court has held that a defendant may bring a challenge to a restitution order in excess of that which is authorized by statute where his appeal waiver expressly reserves the right to appeal a sentence in excess of the statutory maximum. *See United States v. Chem. & Metal Indus., Inc. (C&MI)*, 677 F.3d 750, 752 (5th Cir. 2012). Kim's plea agreement contains no such express reservation. The precise question before us, then, is whether a defendant may appeal a restitution order in excess of the statutory maximum where he has broadly waived his right to appeal and his appeal waiver contains no provision requiring his sentence to be within the statutory maximum. In accordance with our prior case law, he can.

In *United States v. Barnes,* 953 F.3d 383 (5th Cir. 2020), we stated that our case law recognizes "two exceptions to the general rule that knowing and voluntary appellate and collateral-review waivers are enforceable: first, ineffective assistance of counsel, and second, a sentence exceeding the statutory maximum." 953 F.3d at 389–90 (internal citation omitted). *Barnes* cited *United States v. Leal*, 933 F.3d 426 (5th Cir.), *cert. denied*, 140 S. Ct. 628 (2019) as the "first published case, in this circuit, specifically to adopt that [second] exception," though a prior unpublished opinion had purported to adopt it as well. *Id.* at 390 n.10 (citing *Leal*, 933 F.3d at 431, and *United States v. Hollins*, 97 Fed. App'x 477, 479 (5th Cir. 2004) (per curium)).

In *Leal,* we held that a defendant could argue on appeal that the amount in his restitution order exceeded the statutory maximum notwithstanding a valid appeal waiver that lacked an express reservation to that effect. 933 F.3d at 431–32. We explained that it was "of no moment" whether Leal expressly reserved the right to appeal such a claim because, as we previously stated in dicta in *United States v. Keele,* an argument that the restitution amount

exceeded the statutory maximum "would not be barred by an appeal waiver." *Leal,* 933 F.3d at 430 (internal quotation marks and citation omitted).

*Leal* also relied on the "instructive and apposite" reasoning of *United States v. White,* 258 F.3d 374, 380 (5th Cir. 2001), which set forth the principle that a plea agreement cannot waive an argument raised on appeal that the factual basis is insufficient to support a defendant's guilty plea. *Leal,* 933 F.3d at 430. *Leal* stated that the reasoning in *White* applied "with considerable force to the right to be free of a sentence exceeding the statutory maximum[.]" *Id.* at 431. This was "particularly so in Leal's case because his plea agreement stated that any sentence imposed would be 'solely in the discretion of the Court,' '*so long as it is within the statutory maximum.*'" *Id.* (emphasis in original). Importantly, *Leal* explained that this language was significant because it was reflective of defendants' and the Government's shared understanding that promises in plea agreements must be in accord with the law and that the district court will act legally in implementing the agreement and imposing the sentence, including ordering restitution.[1] *Id.*

Lastly, the *Leal* court noted its holding was consistent with at least seven other circuits that recognized an exception to enforcement of an appeal waiver

---

[1] Although the appeal waiver provisions of Leal's and Kim's plea agreements are materially similar, *see Leal*, 933 F.3d at 428, we take note that Kim's plea agreement lacks certain language that appeared elsewhere in Leal's plea agreement. Specifically, Leal's plea agreement noted that "[t]he defendant fully understands that the actual sentence imposed (so long as it is within the statutory maximum) is solely in the discretion of the Court." *Id.* However, we need not be concerned with this difference. In *Barnes*, we recognized that *Leal's* holding was not contingent on the language in the plea agreement. *See* 953 F.3d at 389–90 (recognizing the *Leal* exception without qualification). In doing so, we implicitly acknowledged that the language in Leal's plea agreement stating that the district court had discretion to impose a sentence "so long as it is within the statutory maximum" merely provided additional support for *Leal's* holding because it reflected the parties' acknowledgment of the legal truism that a court must not impose a sentence, including an order of restitution, that is unauthorized by law. *See Bond*, 414 F.3d at 545 ("Everyone knows that a judge must not impose a sentence in excess of the maximum that is statutorily specified for the crime.").

when the sentence exceeds the statutory maximum, and further noted that the Supreme Court, in *Garza v. Idaho*, had acknowledged that "no appeal waiver serves as an absolute bar to all appellate claims, and all jurisdictions appear to treat at least some claims as unwaiveable, including, in some jurisdictions, claims that a sentence . . . exceeds the statutory maximum authorized." *Id.* (quoting *Garza,* 139 S. Ct. 738, 744–45 & n.6 (2019) (internal quotation marks omitted).

We conclude that *Leal's* holding controls the outcome in the present case.[2] According to *Leal*, "a district court imposes a sentence expressly foreclosed by statute when it orders restitution . . . for losses not proximately caused by the defendant," 933 F.3d at 431 (citing *Winchel*, 896 F.3d at 389; *CM&I*, 677 F.3d at 752), and a plea agreement's failure to expressly reserve the right to raise a statutory maximum challenge is "of no moment" because "an 'in excess of the statutory maximum' challenge, if properly raised on appeal, would not be barred by an appeal waiver." *Id.* at 430 (quoting *Keele*, 755 F.3d at 756). While the Government argues that Kim "waived any right to challenge any potential illegality of his sentence," *Leal* states that "even when a defendant, prosecutor, and court agree on a sentence, the court cannot give the sentence effect if it is not authorized by law." *Id.* at 430–31 (alteration omitted).

In sum, based on our prior case law it is clear that an otherwise valid appeal waiver is not enforceable to bar a defendant's challenge on appeal that his sentence, including the amount of a restitution order, exceeds the statutory maximum, notwithstanding the lack of an express reservation to bring such a

---

[2] In *Leal*, restitution was ordered pursuant to 18 U.S.C. § 2259, which mandates restitution for certain child pornography offenses, rather than pursuant to 18 U.S.C. § 3663A. However, this difference is not relevant to the appeal waiver issue.

challenge. Accordingly, Kim's challenge to the legality of his restitution order is not barred, and we can consider the merits of his argument.

## IV.  Calculation of Restitution Amount

The district court ordered Kim to pay $606,250 in restitution pursuant to the MVRA. While Kim does not dispute that he owes $30,000 in restitution based on the 24 counterfeit LOL motherboards that he sold to the CHS, he challenges the remainder of the restitution amount, $576,250, arguing that it is based on the probation officer's speculation that Muraki owed Kim an outstanding debt of $200,000 that represented 461 counterfeit motherboards.

The MVRA authorizes restitution to a victim "directly and proximately harmed by the defendant's offense of conviction." *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012) (internal quotation marks and citation omitted). The MVRA is meant to reimburse the victim's actual loss and should not be used to penalize defendants. *Id.*; *see also United States v. Beydoun*, 469 F.3d 102, 107 (5th Cir. 2006) ("The MVRA does not permit restitution awards to exceed a victim's loss."). Thus, "excessive restitution awards cannot be excused by harmless error; every dollar must be supported by record evidence." *Sharma*, 703 F.3d at 323. The Government has the burden to prove by a preponderance of the evidence the amount of loss suffered by a victim that results directly from the defendant's offense of conviction. *Beydoun*, 469 F.3d at 107 (citing § 3664(a), (e)). Because of the MVRA's proximate cause requirement, it is possible that the "government's proof was sufficient to establish a violation of the [criminal infringement] statute and support a sentence enhancement, but it was insufficient to establish that the actions caused the victims an actual loss" for purposes of ordering restitution. *Id.*

We review de novo whether a restitution award exceeds the statutory maximum, *C&MI,* 677 F.3d at 752, and review for abuse of discretion a district court's determination of a legally permissible restitution amount, *United*

No. 18-51024

*States v. Mahmood*, 820 F.3d 177, 196 (5th Cir. 2016). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Crawley*, 533 F.3d 349, 358 (5th Cir. 2008) (internal quotations marks and citation omitted). The district court's calculation of the restitution amount is a factual finding that is reviewed for clear error. *See United States v. Read,* 710 F.3d 219, 231 (5th Cir. 2012).

In concluding that Kim owed $606,250 in restitution,[3] the district court implicitly credited FBI agent Drebenstedt's testimony that Muraki told him that she owed Kim $200,000 for the purchase of equipment, supplies, and motherboards and implicitly rejected Muraki's affidavit, executed two years later, in which she contradicted these earlier statements. The district court also adopted the methodology utilized in the PSR to convert the alleged amount owed into a quantifiable number of counterfeit motherboards for restitution purposes—i.e., that the outstanding $200,000 represented 461 counterfeit LOL motherboards at an average cost of $434 each, which, when multiped by the retail value of $1,250, equaled restitution of $576,250.[4] In accepting this calculation, the district court erred because the Government failed to carry its burden of properly establishing the number of infringing items placed into commerce that Kim was responsible for and the resulting harm to Scientific Games in terms of lost net profit.

---

[3] The court noted that "[r]estitution owed shall be paid jointly and severally" between Kim and his co-defendant.

[4] Under the "Victim Impact" heading, the PSR states that the probation office provided Scientific Games (the "victim" under the MVRA) with information required by statute, see § 3664(d)(2)(A), and that "[r]eceipt of the Declaration of Losses remains pending." Neither Kim nor the Government reference any declaration in their briefs, and we have not located any declaration in the record.

First, regarding the number of infringing items, we have previously held that there is no loss for restitution purposes for counterfeit items not placed in commerce. In *United States v. Beydoun*, the defendant conspired "to import cigarette rolling papers falsely trademarked as 'Zig–Zags' for resale in the United States" by purchasing low-quality papers and repackaging them using Zig–Zag booklet covers, and created more than one million counterfeit booklets. 469 F.3d at 104. On appeal, Beydoun argued that the district court erred in ordering a restitution amount based on the one million booklets because only 32,640 booklets were "conclusively proven to have been shipped for distribution." *Id.* at 105, 107. We agreed, noting that "the government did not contend that all one million booklets were distributed or sold" and its evidence was therefore "insufficient to establish that the actions caused the victims an actual loss." *Id.* at 107. We explained that "there was no actual loss to the legitimate sellers if the booklets were never placed into commerce and sold," and remanded for the district court "to re-analyze the government's evidence and determine the number of items actually . . . put into the market to compete with legitimate Zig–Zag papers." *Id.* at 108.

The same result follows here. Based on the current record, the Government has not proven by a preponderance of the evidence that Scientific Games' purported loss was proximately caused by Kim's offense, *see Beydoun*, 469 F.3d at 107, in part because the PSR's methodology was based on speculation regarding the number of counterfeit motherboards that $200,000 could have purchased. This conclusion is not supported by the record. Drebenstedt testified that Muraki told him that she owed Kim $200,000 for the purchase of equipment or supplies *and* motherboards, thus clearly contradicting a conclusion that the entire amount was used to purchase motherboards, let alone counterfeit LOL motherboards. Moreover, though agents seized motherboards from 103 gaming machines from Muraki's game

room, not all of the motherboards were LOL motherboards.  Finally, the record indicates that at some point before September 2015 Kim sold authentic LOL motherboards, which suggests that he could have sold authentic motherboards to Muraki.

Second, regarding the amount of actual harm to Scientific Games, we have previously stated that a restitution amount in a case involving infringing or counterfeit goods should be calculated using the "lost net profit" suffered by the victim of the infringement, rather than the retail value of the goods. *Beydoun*, 469 F.3d at 108 ("Because the purpose of the MVRA is to compensate a victim for its losses, the appropriate measure in this commercial setting is lost net profit.").  Calculating the restitution amount based on lost net profit ensures that the victim will be compensated for the actual loss suffered. Basing restitution on the retail value of the goods disregards the costs incurred in manufacturing and selling legitimate goods and could therefore result in the victim receiving a windfall amount that exceeds the actual loss caused by the infringement.  The MVRA does not authorize such an excess penalty.  *Id.* at 107.  Here, the district court—copying from the PSR—used the $1,250 retail value of a LOL motherboard to calculate the restitution order, rather than determining the net profits that Scientific Games lost due to Kim's actions. This was error.

Because it is unclear how much, if any, of the alleged outstanding $200,000 was spent specifically on counterfeit LOL motherboards, and also unclear what the resulting loss in net profit was to Scientific Games, we conclude that the district court erred in ordering restitution based on the speculative loss amount contained in the PSR.  *See Beydoun,* 469 F.3d at 108; *accord United States v. Jones,* 616 Fed. App'x 726, 728 (5th Cir. 2015) (stating that counterfeit pills that were not placed in commerce may not be included in the restitution calculation); *Sharma,* 703 F.3d at 324 (rejecting a restitution

award where the adopted PSR did not indicate a meaningful scrutiny of the sizeable, "obvious mistakes" in the loss calculations submitted by the victims and where the defendant submitted rebuttal evidence). On remand, the district court should "re-analyze the government's evidence" and determine the number of counterfeit LOL motherboards actually sold "and put into the market to compete with legitimate [LOL games]" and the net profit lost by Scientific Games as a result. *Beydoun,* 469 F.3d at 108.

\* \* \*

For the foregoing reasons, the district court's restitution order is VACATED and this case is REMANDED for redetermination of restitution.