# United States Court of Appeals for the Fifth Circuit

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

February 14, 2024

Lyle W. Cayce
Clerk

No. 22-30242

———————————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

MARTY JOHNSON,

*Defendant—Appellant*,

CONSOLIDATED WITH

———————————

No. 22-30249

———————————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

KEESHA DINKINS,

*Defendant—Appellant*.

---

Appeals from the United States District Court
for the Western District of Louisiana
USDC Nos. 5:19-CR-259-1,
5:19-CR-259-2

---

Before Higginbotham, Smith, and Elrod, *Circuit Judges*.

Patrick E. Higginbotham, *Circuit Judge*:

Defendant Marty Johnson, the owner of a mental health rehabilitation clinic, and Defendant Keesha Dinkins, an employee of the clinic, fraudulently billed Medicaid for illegitimate services from sometime in 2014 to January 2018. On the day their jury trial was scheduled to begin, Johnson pled guilty to conspiracy to commit healthcare and wire fraud, and Dinkins pled guilty to misprision of a felony. In each of their plea agreements, Defendants stipulated to a loss of $3.5 million and recommended that the judge order $3.5 million in restitution to the Government.

The district court, accepting the Defendants' recommendations and the factual basis in the Presentence Investigation Report, ordered each to pay $3.5 million in restitution. After receiving the benefit of their plea bargain, both Defendants now argue the $3.5 million order was erroneous, with Dinkins additionally contending that under the sentencing guidelines, the entire loss should not have been attributed to her. We hold Defendants to the plea bargain they made and AFFIRM.

## I.

### A.

Johnson owned and operated Positive Change Counseling Agency, L.L.C., a mental health rehabilitation clinic in Shreveport, Louisiana. Dinkins was a manager and supervisor at Positive Change. From sometime in 2014 to January 2018, Johnson and Dinkins submitted Medicaid claims for

2

services that were not rendered or performed and created false client files to conceal their efforts. Johnson knowingly caused Positive Change to use Medicaid recipients' names and identifying information without their knowledge or consent, directed witnesses to give false statements to law enforcement, and provided them with false dates, times, and services.

On August 28, 2019, Johnson and Dinkins were charged in a 53-count indictment, which included one count of criminal conspiracy, 47 counts of healthcare fraud, four counts of wire fraud, and one count charging Johnson with taking illegal kickbacks. On the day their jury trial was scheduled to begin, both parties pled guilty to bills of information with the agreement that the indictment would be dismissed: Johnson to criminal conspiracy to commit healthcare fraud in violation of 18 U.S.C. §§ 371 and 1357, and wire fraud in violation of 18 U.S.C. § 1343, and Dinkins to misprision of a felony in violation of 18 U.S.C. § 4. All parties—Johnson, Dinkins, and the Government—recommended that the district court order $3.5 million in restitution.

The district court accepted Johnson's and Dinkins's guilty pleas and, on the Government's motion, dismissed their indictment.[1] During the colloquy, both defendants answered affirmatively when asked whether they agreed to recommend $3.5 million in restitution:

> THE COURT: Mr. Johnson . . . . You've agreed to a certain amount of restitution. You're agreeing that they should recommend—that the recommended restitution be three and a half million dollars. . . . And that's what you understood, Mr. Johnson?
>
> DEFENDANT JOHNSON: Yes, Your Honor.

---

[1] The district court confirmed that the plea agreements before the court were the final versions and that "[a]ll previous negotiations were refused."

22-30242
c/w No. 22-30249

. . .

THE COURT: And, Ms. Dinkins . . . . you understand you do your best on restitution, also in the amount of three and a half million. Is that pretty much it—

DEFENDANT DINKINS: Yes, Your Honor.

In sum, Johnson and Dinkins each agreed to pay $3.5 million in restitution, and the Government agreed to dismiss their remaining charges. Specifically, both agreements contained two relevant provisions: (1) "The government and [Defendant] recommend that [Defendant] be assessed loss of $3,500,000.00 *under the United States Sentencing Guidelines*," and (2) "The government and [Defendant] recommend that [Defendant] be assessed restitution of $3,500,000.00 to be made payable immediately to the victim, the United States Government." The agreements also acknowledged that the agreed restitution did not bind the district court and that the court would determine the amount of restitution owed after its own evaluation of the evidence.[2] Neither plea agreement specified whether the recommended restitution and loss assessment were to be issued pursuant to the Mandatory

---

[2] The agreements stated:

In addition to the penalties set forth in the preceding paragraphs, the Court shall order restitution in this case, and the defendant agrees that notwithstanding any recommendations by the parties in this plea agreement, restitution in this case may not be limited to the amounts or victims referred to in the specific charge(s) to which the defendant has pled guilty and will be determined by the Court after a complete review of the evidence developed in the investigation of this case by the government and further investigation by the United States Probation Office as contained in the presentence report;

. . .

The government and [Defendant] acknowledge that the loss and restitution recommendations from the parties are not binding on the Court and that loss and restitution shall be determined by the Court.

Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, or the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663(a).

**B.**

The Presentence Investigation Reports for both Johnson and Dinkins were prepared after the district court accepted their plea agreements and explained:

> Investigative material provided by the Government revealed that from 2015 to 2017, Positive Change billed Medicaid $176,462.43 for transportation services for which Medicaid paid $165,803.68. From 2014 to 2018, Positive Change billed Medicaid $11,892,091.48 for Mental Health Rehabilitation Services for which Medicaid paid $7,981,266.09. Medicaid paid a total of $8,147,069.77. *After interviews with both clients and employees of Positive Change, as well as an extrapolation of the afore-mentioned figures, the agent with the Office of Inspector General (OIG) determined the actual loss amount for guideline purposes to be $3,500,000.*

After receiving the PSRs and before the sentencing hearing, both Defendants submitted objections to the restitution calculation on separate grounds. Dinkins objected to allocating the entire $3.5 million loss to her. She argued that she was unaware of the purpose of creating fraudulent files, so "any loss attributed directly to Dinkins would be far less than the $3.5 million total loss amount calculated by the OIG." She "acknowledge[d] that in Section E. of her plea agreement she recommends that the loss attributable to Positive Change's activities was $3.5 million for sentencing guidelines and restitution purposes," but she noted that "the plea agreement makes it clear that the recommendation is not binding on the Court, and it can make its own determination of the amount of loss." Notably, Dinkins did not object to the

5

22-30242
c/w No. 22-30249

$3.5 million calculation itself,[3] and neither defendant disputes that restitution is applicable and warranted. By contrast, Johnson filed objections to the PSR and a supplemental pre-sentencing memorandum challenging the loss and restitution calculation. In response, the Government provided more details about the $3.5 million figure in its Sentencing Memorandum:

> Because of the pervasive fraudulent billing practices of PCCA [Positive Change] which yielded volumes of documentation and data, investigators assessed the loss by extrapolating representative samples of fraudulent documents during the time period between 2014 and 2018. From the extrapolation, investigators estimated loss to Medicaid. Because some services were in fact provided, investigators took a conservative approach to assessing loss. This is a common approach that Medicaid officials use to assess loss when it is not feasible to examine every bill submitted because of the substantial volume of documentation and data. Furthermore, the $3,500,000 loss figure is consistent with the interviews with former clients and employees and documents seized at PCCA during the execution of the federal search warrant.

## C.

At the sentencing hearing held on April 19, 2022, the Government entered into evidence an itemized spreadsheet to support its restitution

---

[3] In fact, during the sentencing hearing, Dinkins's counsel specifically denied challenging the factual basis and the restitution calculation and narrowed his objection to the court's attribution of the entire $3.5 million loss to Dinkins:

> THE COURT: She's . . . not trying to tell me that the factual basis . . . is in error.
>
> MR. McMICHAEL: I'm not trying to tell you that.
> . . .
> MR. McMICHAEL: My argument was directed at the use of the entire amount that the government claims was lost against her sentencing guidelines.

calculation. This spreadsheet, and its seeming inconsistencies, is the main basis for the Defendants' argument that the restitution calculation was erroneous. The spreadsheet appears to list fraudulently billed services and corresponding payments that Positive Change received from Medicaid from 2015 to 2017, totaling $710,120.18. In addition, the spreadsheet notes that Medicaid paid a total of $725,250.73 for unreasonable services between 2015 and 2017. The Government then (1) calculated the sum of the discrepant figures ($1,435,370.41) and represented to the court that the sum reflected fraud perpetuated between "2015-2017," and (2) multiplied the sum by three years to reach a total of $4,306,111.23 in fraudulent payments.[4]

The district court first addressed Johnson's objection regarding the method to calculate restitution and said that "the government's correct that I need to make a reasonable estimate of the loss." Then, the district court "adopt[ed] the factual findings of the probation office contained in [Johnson's] presentence report and its addendum." The district judge issued a sentence of 60 months' imprisonment and ordered Johnson to pay $3.5 million in restitution, jointly and severally with Dinkins. The court declined to order that Johnson pay a fine "based on the amount of restitution."

Next, the district court overruled Dinkins's objection that the entire agreed-upon loss of $3.5 million should not be attributed to her, stating: "She's not trying to withdraw her guilty plea, she's not trying to tell me that she didn't really do what she pled guilty to, and she's not trying to tell me that the factual basis . . . is in error." The district court further rejected Dinkins's argument that joint and several liability was inappropriate given her claim that she played only a limited role in the fraud. Finally, Dinkins

---

[4] The offense level calculation is notable. Pursuant to § 2B1.1, if the loss was more than $1.5 million but no more than $3.5 million, the defendant receives 16 points. U.S.S.G. § 2B1.1. Here, Johnson and Dinkins received 16 points.

argued that she "only signed the factual basis because it was written that [the district judge] would decide the amount of loss" and that she "would never have agreed to $3.5 million if it would send [her] to jail" because she did not own Positive Change and claims that she did not receive money from the company beyond her salary. The district court rejected these arguments, finding that "[her role] was not a limited role," and sentenced Dinkins to 24 months' imprisonment along with $3.5 million in restitution.[5] The judge declined to order a fine due to her "financial condition." The court did not specify the statutory basis for either of its restitution orders.

### D.

After sentencing, both defendants filed timely notices of appeal. They also filed nearly identical motions with the district court to stay the restitution order pending appeal. Defendants argued that there was a "substantial question of law . . . namely, whether the Government established the restitution amount . . . by a preponderance of the evidence." The district court denied both motions to stay the restitution orders after finding that "neither Defendant has made a showing of likelihood of success on the merits. There is little chance that either Defendant can prevail on any claim against the restitution order given that each Defendant expressly agreed in the plea agreement to the precise amount of restitution."

### II.

This Court reviews the legality of a restitution order de novo and factual findings, including the amount of loss incurred, for clear error.[6] "[P]reserved error as to the quantum of a restitution award" is reviewed for

---

[5] As a result of her plea, Dinkins faced a three-year statutory maximum.

[6] *United States v. Read*, 710 F.3d 219, 231 (5th Cir. 2012).

22-30242
c/w No. 22-30249

an abuse of discretion.[7] An abuse of discretion occurs when a court's "ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."[8]

Unpreserved objections are reviewed for plain error, which occurs when there was error, that was plain, and that "affected the defendant's substantial rights."[9] Then, the court "will exercise [its] discretion to correct the error if it seriously affects the fairness, integrity or public reputation of judicial proceedings."[10]

## III.

First, Johnson and Dinkins argue the district court erred in ordering $3.5 million in restitution. Their arguments are unpersuasive.[11]

## A.

Although the district judge did not specify the statutory basis for its restitution order, the MVRA applies by its terms, as well as by the terms of the VWPA. The MVRA uses the mandatory language "shall" when directing district courts to order restitution for specified offenses: "Notwithstanding any other provision of law, when sentencing a defendant

---

[7] *United States v. De Leon*, 728 F.3d 500, 507 (5th Cir. 2013) (citations omitted).

[8] *United States v. Crawley*, 533 F.3d 349, 358 (5th Cir. 2008) (citations omitted).

[9] *United States v. Lozano*, 791 F.3d 535, 537 (5th Cir. 2015) (citations omitted).

[10] *Id.*

[11] Johnson objected to the restitution calculation in the district court, but Dinkins did not. Therefore, this Court should review Johnson's claim regarding the loss calculation for clear error, and the restitution amount imposed for an abuse of discretion. It should review Dinkins's claims regarding the loss and restitution calculation for plain error.

convicted of an offense described in subsection (c), the court shall order . . . that the defendant make restitution to the victim of the offense." [12]

The specified offenses are listed in in subsection "c" of the MVRA, which states in relevant part: "This section shall apply in all sentencing proceedings for conviction of, or plea agreements relating to charges for, any offense—(A) that is . . . an offense against property under this title . . . including any offense committed by *fraud or deceit*." [13] Johnson pled guilty to conspiracy to commit healthcare fraud under 18 U.S.C. § 1347, which is an offense clearly covered by subsection "c" of the MVRA.

Subsection "c" also states that "in the case of a plea agreement that does not result in a conviction for an offense described in paragraph (1), this section shall apply only if the plea specifically states that an offense listed under such paragraph gave rise to the plea agreement." [14] Dinkins pled guilty to misprision of a felony, with 18 U.S.C. § 1347 as the underlying felony. Furthermore, the VWPA's own language confirms that the MVRA applies, as the VWPA excludes its application from any "offense described in section 3663A(c)." [15]

---

[12] 18 U.S.C. § 3663A(a)(1).

[13] 18 U.S.C. § 3663A(C)(1)(A) (emphasis added).

[14] 18 U.S.C. § 3663A(c)(2).

[15] 18 U.S.C. § 3663(a)(1)(A); *see also United States v. Malone*, 747 F.3d 481, 487 (7th Cir. 2014) (stating "that any order of restitution was governed by the mandatory restitution provisions of the MVRA rather than the VWPA" in a bank fraud case).

22-30242
c/w No. 22-30249

**B.**

Under the MVRA, any restitution amount imposed must not exceed the victim's "actual loss."[16] Specifically, the government must prove the amount of loss resulting from the defendant's conduct by a preponderance of the evidence.[17] In healthcare fraud cases, the defendant may have the actual loss amount offset by the actual value of bona fide services provided.[18] Under the MVRA, the defendant has the burden to show the amount of legitimate services provided to offset against the actual loss.[19] Moreover, plea bargains must also comply with Federal Rule of Criminal Procedure 11, which imposes an additional requirement that the district court "determine that there is a factual basis for the plea."[20]

The district judge did not err under the MVRA in ordering $3.5 million in restitution. First, the $3.5 million amount does not exceed the Government's actual loss from the scheme and is based on adequate evidence. The district court relied on estimations drawn from the record, the PSRs (which considered interviews from clients and employees of Positive Change), and both Defendants' factual stipulations and plea agreements, which were accepted in open court with adequate counsel. Both Johnson and Dinkins unequivocally agreed that the actual loss was $3.5 million and to recommend $3.5 million in restitution. Neither challenged the calculation or the loss amount before the court accepted their pleas. Indeed, the $3.5 million

---

[16] 18 U.S.C. § 3663A(b)(1)(B); *United States v. Kim*, 988 F.3d 803, 811 (5th Cir. 2021) ("The MVRA is meant to reimburse the victim's actual loss and should not be used to penalize defendants.").

[17] *Kim*, 988 F.3d at 811 (citations omitted).

[18] *United States v. Ricard*, 922 F.3d 639, 658 (5th Cir. 2019).

[19] 18 U.S.C. § 3664(e); *Ricard*, 933 F.3d at 659.

[20] Fed. R. Crim. P. 11(b)(3).

sum is less than half of the total amount Medicaid paid to Positive Change (approximately $8.1 million), and neither Defendant offered rebuttal evidence to offset the loss amount, as required in healthcare fraud cases under the MVRA. Defendants' complaints about the spreadsheet also have no sway: any difference between it and the OIG's $3.5 million amount may be explained by the fact that the OIG reached $3.5 million after considering evidence, including interviews with clinic employees and clients, *for which the spreadsheet did not appear to account.* That is, the spreadsheet represents only one of many pieces of evidence in this case; it is not determinative.[21] There was sufficient evidence for the district judge to find that the actual loss from the scheme was $3.5 million.

Second, it makes no difference that the pleas acknowledged the district court's power to decide the amount of restitution after reviewing the evidence—it ultimately did so. And, again, the district court did not exceed the amount to which Defendants admitted under oath and in their plea agreements—it matched the amount—exactly.

In sum, the district court was well within its power to impose $3.5 million in restitution. The amount fell below the estimated amount in the Government's proffered spreadsheet (which is inherently an estimate); matched the Defendants' factual stipulations, plea agreements, and in-court admissions; matched the amount recommended in the PSRs; and totaled less than half of the payments Medicaid sent to Positive Change over the relevant time period—approximately $8.1 million. Moreover, that Defendants agreed

---

[21] As Defendants note, the district judge stated that he needed to make a "reasonable estimate of the loss," while the MVRA requires that the amount of restitution not exceed the victim's "actual loss." Ultimately, the district judge adopted the factual findings of the PSR, which stated unequivocally that the "actual loss amount" was $3.5 million.

22-30242
c/w No. 22-30249

to recommend $3.5 million *on the day of their scheduled trial*, after all preparation and document review had presumably occurred, lends additional credibility to their admissions.

The criminal justice system in this country relies on plea agreements to provide efficient resolutions to criminal cases. Indeed, over 95 percent of federal criminal cases are resolved without trial.[22] It would undermine the principle that plea bargains are contracts to hold that a party can agree to a specific amount of restitution, supported by record evidence, and then in the next breath, challenge an order imposing that exact amount of restitution.[23]

## IV.

Second, we reject Dinkins's argument that the district court erred by using $3.5 million in restitution to calculate her sentencing range under U.S.S.G. § 2B1.1. Relevant here, Section 2B1.1 requires the district court to impose a 16-level increase if the offense involved between $1.5 and $3.5 million in losses.[24] When calculating the loss, the district court may hold the

---

[22] Stephanos Bibas, Essay, REGULATING THE PLEA-BARGAINING MARKET: FROM CAVEAT EMPTOR TO CONSUMER PROTECTION, 99 CALIF. L. REV. 1117, 1118–19, 1119 n.2 (2011) (citations omitted).

[23] *See generally Ricketts v. Adamson*, 483 U.S. 1, 16 (1987) (Brennan, J., dissenting) ("This Court has yet to address in any comprehensive way the rules of construction appropriate for disputes involving plea agreements. Nevertheless, it seems clear that the law of commercial contract may in some cases prove useful as an analogy or point of departure in construing a plea agreement, or in framing the terms of the debate."); *United States v. Howle*, 166 F.3d 1166, 1168 (11th Cir. 1999) ("A plea agreement is, in essence, a contract between the Government and a criminal defendant."); Colin Miller, *Plea Agreements as Constitutional Contracts*, 97 N.C. L. REV. 31 (2018) (developing rules of construction grounded in contract law for plea agreements).

[24] U.S.S.G. § 2B1.1(b)(1)(I).

22-30242
c/w No. 22-30249

defendant responsible for any "pecuniary harm" that the defendant knew or "reasonably should have known, was a potential result of the offense."[25]

Dinkins argues that the entire loss resulting from Positive Change's healthcare fraud should not be attributed to her because she had a "limited role in the offense." She claims that because "[s]he was not aware of or involved in supervising clinical activities, did not prepare or send bills to MCOs and did not receive any of the fraudulently obtained funds or profits from Positive Change," it is "unfair to attribute the entire loss amount to her for restitution purposes." She also claims that in her plea agreement, she agreed only that "the loss attributable to Positive Change's [as opposed to her own] activities was $3.5 [m]illion for sentencing guideline and restitution purposes."

These arguments are contradicted by the record. Apart from Dinkins's assertions that she played only a limited role in the fraud, which the district court did not find credible, there is no evidentiary basis by which to hold that Dinkins was not responsible for the entire $3.5 million loss. First, contrary to her attempts to restate the plea agreement, it expressly states that Dinkins—*not* Positive Change—was responsible for the $3.5 million loss.[26] Dinkins cannot direct the Court to a provision in the plea agreement

---

[25] U.S.S.G. § 2B1.1 cmt. 3(A)(iv).

[26] The plea agreement stated:

1. The government and KEESHA DINKINS recommend that KEESHA DINKINS be assessed a loss of $3,500,000.00 under the United States Sentencing Guidelines.

2. The government and KEESHA DINKINS recommend that KEESHA DINKINS be assessed restitution of $3,500,000.00 to be made payable immediately to the victim, the United States Government.

indicating that the $3.5 million amount would be assessed only to Positive Change, not to her. That is because such a provision does not exist.

Similarly, Dinkins's unequivocal statements and admissions at the plea colloquy reflect her understanding that *she* would be held responsible for the $3.5 million loss:

> THE COURT: And, Ms. Dinkins . . . you understand *you do your best* on restitution, also in the amount of three and a half million. Is that pretty much it—
>
> DEFENDANT DINKINS: Yes, Your Honor.

Finally, there was sufficient record evidence on which the district court could rely when attributing the $3.5 million loss amount to Dinkins. During the plea hearing, she affirmed her stipulated factual basis under oath and admitted that she knew Johnson was submitting false claims to Medicaid for services never rendered. She also admitted that she supervised the "cut and paste" sessions when she and the staff created fake patient files.

The district court did not err in taking Dinkins's admissions in the plea agreement and at the plea colloquy as evidence that Dinkins caused, or reasonably knew that her actions could cause, a loss totaling $3.5 million. While Dinkins raised this objection at sentencing, nowhere in the plea agreement or in the plea colloquy did Dinkins express her understanding that the $3.5 million would be assessed to Positive Change, not to her. Any such claimed "understanding" is directly contradicted by Dinkins's stipulations and in-court admissions. In sum, the district court did not err in attributing the entire $3.5 million loss to Dinkins for sentencing guideline purposes.

## V.

Represented by competent counsel, Johnson and Dinkins took plea bargains to minimize losses from their multi-year, multimillion-dollar fraudulent scheme. Now they wish to keep part of the bargains and challenge

the amount of restitution—despite their express agreement to the precise amount imposed—by attempting to fault the Government for not making a more robust presentation of that agreed-upon amount. This will not do.

The district court's restitution order is valid under the MVRA. There was an adequate factual basis to support the pleas, the restitution amount did not exceed the actual loss, and the district court appropriately used the total loss amount when calculating Dinkins's sentence. Johnson and Dinkins received the benefit of their agreements when the Government dismissed their 50-plus count indictment; they must now make good on their end of the bargains. We AFFIRM.

No. 22-30242
c/w No. 22-30249

JENNIFER WALKER ELROD, *Circuit Judge*, concurring:

I concur in the majority opinion because Johnson and Dinkins failed to press their claim by providing evidence against the PSR's findings.[27] I write separately to highlight some concerns with the restitution calculation.

The MVRA is unambiguous in its requirements and consistently uses the mandatory language "shall." "Notwithstanding any other provision of law," when sentencing a defendant convicted under the MVRA, "the court *shall* order . . . restitution." 18 U.S.C. § 3663A(a)(1) (emphasis added). "The order of restitution *shall* require that such defendant . . . pay an amount equal to" the value of the loss caused less the value of any returned property. *Id.* at § 3663A(b)(1)(B) (emphasis added). "This section *shall* apply in all sentencing proceedings for convictions of, or *plea agreements* relating to" offenses under this section. *Id.* at § 3663A(c)(1) (emphasis added).

Thus, district court judges, in cases of fraud where the MVRA applies, are required to calculate the loss caused by the fraudulent scheme and order restitution in that amount, regardless of whether the defendant went to trial or entered a plea agreement. Our caselaw is likewise consistent in its interpretation of the MVRA. *See, e.g.*, *United States v. Kim*, 988 F.3d 80, 811 (5th Cir. 2021) ("The MVRA is meant to reimburse the victim's actual loss and should not be used to penalize defendants." (citations omitted)).

The district court relied on two pieces of evidence provided by the government in determining an actual loss amount of $3,500,000. First, the PSR found an actual loss of $3,500,000 based on an investigation by the Office of Inspector General.

---

[27] I agree with the majority opinion that the district court did not err in attributing the entire $3,500,000 loss to Dinkins and I do not address that issue here.

Second, *after the conclusion of sentencing*, the government submitted an itemized spreadsheet demonstrating losses above $3,500,000. The spreadsheet was not seen by defense counsel until an hour before the sentencing hearing and not entered into evidence until *after* the sentencing hearing. This means Johnson and Dinkins were sentenced to the $3,500,000 restitution order without all the evidence in the record and without an opportunity to respond to the new evidence submitted into the record after sentencing.

Further, that spreadsheet contains a two-year figure of $1,435,370.41. That number was multiplied by three to reach a total of $4,306,111.23. This suggests that the fraudulent scheme lasted a total of six years (two years multiplied by three). However, the PSR states that the scheme only lasted four years. That would suggest that the two-year figure should only have been multiplied by two. This results in a loss of $2,870,740.82, less than the $3,500,000 restitution order.

When calculating restitution under the MVRA, we generally apply a burden shifting framework. The government bears the burden of demonstrating "the amount of the loss sustained by a victim." 18 U.S.C. § 3664(e). The defendant then "has a burden to show entitlement to an offset against the amount of actual loss." *United States v. Ricard*, 922 F.3d 639, 659 (5th Cir. 2019) (citing *United States v. Mathew*, 916 F.3d 510, 521 (5th Cir. 2019)).

We have consistently held that where there is insufficient record evidence to support a restitution order as reflecting the actual loss of the victim, that order is unlawful and must be vacated and remanded to the district court. *See United States v. Boccagna*, 450 F.3d 107, 117, 121 (5th Cir. 2006) (vacating and remanding a restitution order because "the MVRA does not permit awards 'in excess of the amount of the [victim's] loss'" (citation omitted) (alteration in original)); *United States v. Sharma,* 703 F.3d 318, 327 (5th Cir. 2012) (vacating the restitution order and remanding to the district

court for specific findings in the record of the actual loss); *United States v. Arledge*, 553 F.3d 881, 899, 901 (5th Cir. 2008) (declining to adopt harmless error analysis, and vacating and remanding the restitution award because less than 1% of the total was unsupported by record evidence); *United States v. De Leon*, 728 F.3d 500, 508–09 (5th Cir. 2013) (vacating and remanding the restitution order because the district court *plainly erred* by relying on an overinclusive PSR figure); *United States v. Majors*, No. 2040405, 2022 WL 301545 at *2 (5th Cir. Feb. 1, 2022) (unpublished) (vacating and remanding for a recalculation of the restitution order because the PSR lacked an "'adequate evidentiary basis'" (quoting *United States v. Cantu-Ramirez*, 669 F.3d 619, 629 (5th Cir. 2012)).

Johnson and Dinkins could have attempted to satisfy their burden by demonstrating that: (1) "proffer[ing] evidence that the services that [Positive Change] rendered to patients were legitimate;" and (2) "that [Medicaid] would have paid for those services but for his fraud." *United States v. Mahmood*, 820 F.3d 177, 194 (5th Cir. 2016) (citation omitted). Johnson and Dinkins, however, did not submit any evidence either contesting the PSR's determination or demonstrating that they were entitled to a greater offset for bona fide services. Even at oral argument, counsel for the defendants did not even have a number in mind for the amount of the actual loss suffered by the victims.

*        *        *

The MVRA does not permit us to cut corners in making restitution calculations simply because there is a plea agreement. 18 U.S.C. § 3663A(c)(1). The statutory terms mandate calculation of the actual loss caused by the defendant, whether that defendant went to trial or pleaded guilty. But here, Johnson and Dinkins failed to counter the information in the PSR report or suggest that they deserved a greater offset for bona fide

No. 22-30242
c/w No. 22-30249

services.  Accordingly, I concur.