# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 6, 2024

Lyle W. Cayce
Clerk

No. 22-30747

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

JOSEPH ANTHONY BORINO,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CR-237-1

Before SMITH, ENGELHARDT, and RAMIREZ, *Circuit Judges*.
KURT D. ENGELHARDT, *Circuit Judge*.

As part of a plea agreement, Joseph Anthony Borino pleaded guilty, on July 8, 2021, to misprision of a felony (wire fraud), in violation of 18 U.S.C. § 4. On November 1, 2022, the district court sentenced Borino to serve a term of imprisonment of one year and one day. Thereafter, on March 30, 2023, following briefing and argument by counsel, the district court ordered restitution, pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, in the amount of $21,223,036.37. The district court imposed restitution jointly and severally with that imposed on Denis Joachim, Borino's close friend and employer, by another section of the court

No. 22-30747

in a separate proceeding.  On appeal, Borino challenges his restitution award on several grounds. Considering the instant record and applicable law, we AFFIRM.[1]

## I.

This appeal arises from the prosecution of the owners and certain employees, including Borino, of Total Financial Group, Inc. (TTFG), a Louisiana-based company founded in 2005 and co-owned by husband and wife Denis and Donna Joachim. TTFG marketed and operated a health care benefit program called the "Classic 105 Program." Denis Joachim and Donna  Joachim, TTFG's Chief Executive Officer and Chief Operating Officer, respectively, designed the program. Borino's employment at TTFG began in 2012.  He served as the company's Executive National Marketing Director. In that role, Borino was involved in developing TTFG's marketing strategy, materials, and presentations for the Classic 105 Program.  He was also responsible for handling and resolving issues or problems that agents,

_____

[1] In addition to contesting their merit, the government maintains that certain of Borino's contentions are barred by the waiver of appeal included in his plea agreement. *See, e.g., United States v. Meredith*, 52 F.4th 984, 986 (5th Cir. 2022) (confirming that the right to appeal, which is statutory rather than constitutional in nature, can be waived). Borino disagrees, arguing that the provision of his plea agreement that reserves his right to appeal "a sentence in excess of the statutory maximum" applies to all of the issues he presents for review.  Finding no reversible error in the district court's restitution order, we pretermit further consideration of the applicability of Borino's appeal waiver. *See United States v. Madrid*, 978 F.3d 201, 206 (5th Cir. 2020) (appeal waivers are not jurisdictional); *see also United States v. Thomas*, No. 23-10735, 2024 WL 4054376, at *3 (5th Cir. Sept. 5, 2024) (assuming without deciding that claims were not barred by appeal waiver and considering merits of appellant's arguments); *United States v. Munoz*, No. 22-10451, 2023 WL 3582684, at *2 (5th Cir. May 22, 2023) ("Because appeal waivers do not deprive us of jurisdiction, we assume arguendo that consideration of these claims is not precluded by the waiver, and we conclude that they lack merit.); *United States v. Miller*, No. 22-10915, 2023 WL 3179205, at *1 (5th Cir. May 1, 2023), *cert. denied*, 144 S. Ct. 265 (2023) ("We pretermit consideration of the applicability of the appeal waiver and reach the merits.").

prospective clients, and enrolled clients encountered, frequently answering questions posed to regional sales agents by prospective customers about the intricacies of the Classic 105 Program. Borino described himself as Denis Joachim's "second in command" and, in marketing the Classic 105 Program, represented that he knew all parts of it.

### A. "Classic 105 Program"

The Classic 105 Program purported to be a supplemental group health benefits plan—a medical reimbursement account ("MRA") program that would reimburse participating employees for qualifying medical expenditures not covered under their employers' primary insurance plans. Under the program, individuals contributed approximately $1000 per month, while family-plan holders contributed $1,600 per month. TTFG represented that those contributions would be held in trust in an individual reimbursement account assigned to the participant until the employee made a claim, at which point the appropriate repayment would be drawn from the account.

Because the required monthly contribution amounts would make participation cost-prohibitive for a substantial number of potential enrollees, the Classic 105 Program was marketed to prospective employer-clients as a MRA plan with employee-participant contributions offset by a loan arrangement. More particularly, TTFG informed participants that it would arrange for a third-party lender to provide loans sufficient to cover the employees' monthly contributions. The loans would be secured by an insurance policy on the life of the participant that would be payable to the lender at the time of the participant's death, when repayment of the loan also would become due.

Notwithstanding this description of the program's funding mechanism, program participants did not actually receive loan proceeds from

a third-party lender and then pay the requisite ($1,000 or $1,600) contribution each month to TTFG.  Instead, TTFG agents told employer-clients that it would be easier and more efficient (requiring less paperwork) to have the lender send the loan money directly to TTFG to hold in a trust account.

In contrast, the administrative fees that TTFG charged program participants—a rate of $150–$250 per month for employees and a 5% rate for employers—were paid by participants each month. At TTFG's instruction, employer-clients withheld administrative fees from employee-participants' paychecks and then transmitted them to TTFG headquarters. But these fees, TTFG represented, would largely be offset by allegedly legitimate tax savings.

TTFG's marketing efforts were effective—350 employer-clients and 4,000 employee-participants enrolled in the Classic 105 Program. And TTFG collected $25,265,444.21 in administrative fees from its employer-clients and employee-participants between approximately 2013 until January 2017, while paying only $376,916.10 in claims made by program participants, yielding a net amount of $24,888,528.11.

Unbeknownst to enrollees, however, but known to the Joachims and Borino, nearly every component of the Classic 105 Program was not as represented. The Classic 105 Program did not function in the manner of a medical reimbursement program operated in accordance with the requirements of the Internal Revenue Code. Instead, TTFG commingled assets, pooling all fees it collected into a single business operating account, and paid claims from the collected administrative fees, *not* participant contributions. In fact, no actual contributions were made because TTFG never obtained a single loan or any other source of the financing that it purported to have arranged to provide the loans that program participants

were told would fund their contributions. Similarly, TTFG did not secure any life insurance policies to collateralize loans. Thus, the only "contributions" were mere "paper transactions" that never actually occurred.

## B. District Court Proceedings

On August 30, 2018, Denis and Donna Joachim were charged by a federal grand jury in the Eastern District of Louisiana. *See United States v. Denis John Joachim, Donna Kennedy Joachim, and The Total Financial Group, Inc.,* Criminal Action No. 18-189 "J" (E.D. La.).[2] Borino was charged

---

[2] On December 6, 2018, a federal grand jury issued a thirty-four count Superseding Indictment against Denis Joachim, Donna Joachim, and TTFG. *See United States v. Denis John Joachim*, et al, Criminal Action No. 18-189 "J" (E.D. La.). It charged conspiracy to defraud the IRS and to make false statements and representations in connection with a multiple employer welfare arrangement, in violation of 18 U.S.C. § 371 (Count 1); aiding or assisting in preparation of false statements on federal income tax returns, in violation of 26 U.S.C. § 7206(2) (Counts 2–13); making false statements and representations in connection with a multiple employer welfare arrangement, in violation of 29 U.S.C. § 1149 (Counts 14–18); conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count 19); wire fraud, in violation of 18 U.S.C. § 1343 (Counts 20–25); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 26); and money laundering, in violation of 18 U.S.C. § 1957 (Counts 27–34). The Joachims and TTFG entered guilty pleas, pursuant to written plea agreements, on May 30, 2019.

Denis Joachim pleaded guilty to one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 26). On March 17, 2022, he was sentenced to serve a term of imprisonment of 97 months followed by a three-year term of supervised release. On December 7, 2022, upon a motion and stipulation of the parties, Denis Joachim was ordered to pay $24,888,528.11 in restitution to the employer-clients and employee-participants enrolled in the Classic 105 Program. The restitution amount was imposed jointly and severally with the restitution amount to be imposed on Borino.

Donna Joachim pleaded guilty to one count of conspiracy to defraud the IRS and to make false statements and representations in connection with a multiple employer welfare arrangement, in violation of 18 U.S.C. § 371 (Count 1). On March 17, 2022, she was sentenced to serve a term of imprisonment of twelve months and one day, followed by a three-year term of supervised release. On December 7, 2022, upon a motion and

separately, in an eight-count indictment issued by a federal grand jury, on November 21, 2019, and, on December 5, 2019, in an eight-count superseding indictment. The superseding indictment charged Borino with conspiracy to defraud the IRS, to make false statements and representations in connection with a multiple employer welfare arrangement, and to commit wire fraud (Count 1); substantive acts of making false statements and representations in connection with a multiple employer welfare arrangement (Counts 2–6); and substantive acts of wire fraud (Counts 7-8). On June 29, 2021, Borino was charged with misprision of a felony (wire fraud) in a one-count superseding bill of information.

Nine days later, on July 8, 2021, Borino pleaded guilty, pursuant to a plea agreement, to the single count of misprision of a felony (wire fraud), charged in the June 29, 2021 superseding bill of information. In support of his plea, Borino executed a ten-page factual basis describing his employment at TTFG, his involvement with the Classic 105 Program, the scope of the wire fraud, in violation of 18 U.S.C. § 1343, and his misprision of wire fraud. The factual basis described the wire fraud as the interstate transmission of administrative fees paid to TTFG by over 350 employers and 4,400 employees who "were defrauded into enrolling in, and paying fees for, the Classic 105 program by means of fraudulent pretenses, representations, and promises." The factual basis also acknowledged that, in addition to the monetary loss of the fees paid, TTFG's fraud also resulted in enrollees'

---

stipulation of the parties, Donna Joachim was ordered to pay $23,343,442.70 in restitution to the IRS.

A forfeiture agreement was filed on June 28, 2019, and a preliminary order of forfeiture was entered on July 19, 2019.

underreporting and underpaying taxes, which exposed them to potential adverse financial consequences.

The factual basis demonstrated Borino's involvement in and misprision of the fraud—that he represented to subordinates and prospective enrollees that a loan component was in place, when he knew one was not, and his active concealment of that fact. Borino made these representations despite knowing, at least as early as September 2014, and being reminded multiple times during the remainder of his tenure at TTFG, that no loan component actually existed. Finally, the factual basis provided examples of how and when he was so informed and reminded.

Borino's plea agreement provided that, in exchange for entering a guilty plea, the government would not "bring any other charges in the Eastern District of Louisiana against the defendant arising from the conduct detailed in the Factual Basis, as long as the defendant has truthfully informed federal agents of the details of these crimes," and would move to dismiss all remaining counts of the underlying charging documents. The plea agreement also stated "that the restitution provisions of Sections 3663 and 3663A of Title 18, United States Code, will apply."

Borino's Pre-Sentence Investigation Report concluded that the loss attributable to him was the entirety of the fees—reportedly $25,543,340.78— that the Classic 105 Program enrollees had paid to TTFG. The PSR also observed that the MVRA applied.  At sentencing, the district court confirmed that Borino had had sufficient time to review the PSR and had no objections thereto. The district court "adopt[ed] the [PSR] as to the factual background of [Borino's] offense into the record" and imposed a sentence of imprisonment of twelve months and one day.  A separate restitution hearing was scheduled to be held after the Joachims' restitution orders were determined.

No. 22-30747

Prior to Borino's March 30, 2023 restitution hearing, the parties submitted memoranda for the district court's consideration. At the hearing, the parties presented argument but provided no additional documentary evidence or testimony. Having determined that the MVRA applied, and that the payors of the Classic 105 Program's administrative fees were MVRA victims, the district court calculated the amount of restitution that Borino owed as the total amount of fees paid during the temporal scope (September 2014 through January 10, 2017) of the misprision offense charged in the bill of information ($21,510,389.60), minus a credit of the total dollar amount of the claims that TTFG paid during the same period ($287,353.23), for a total net amount of $21,223,036.37. The district court imposed Borino's restitution jointly and severally with the $24,888,528.11 restitution that Denis Joachim was ordered to pay by another section of court.

This appeal followed.

## II.

On appeal, Borino challenges the district court's restitution order on three independent grounds. He argues that (1) misprision of a felony is not an offense to which the MVRA applies; (2) the government failed to prove that the "Classic 105 Program" participants, to whom restitution was ordered, suffered the requisite *actual* pecuniary loss; and (3) the district court ordered restitution for losses that were not directly and proximately caused by *his* misprision offense.

## A.

The Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, provides that, when a defendant has been convicted of, *inter alia*, "an offense against property under [Title 18] . . . including any offense committed by fraud or deceit" for which "an identifiable victim or victims has suffered . . . pecuniary loss," the sentencing court "shall order . . . that

the defendant make restitution to the victim of the offense." 18 U.S.C. §3663A(a)(1), (c)(1)(A)–(B). The MVRA defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

The procedures by which the sentencing court imposes a restitution order are found in 18 U.S.C. § 3664. *See* §3663A(d).[3]  After a defendant pleads or is found guilty of a covered crime, a federal probation officer provides the court with a report that, *inter alia*, identifies the victims of the defendant's crime and their losses, as well as the economic circumstances of the defendant. *See* § 3664(a) (probation officer to obtain and provide information sufficient for the court to exercise its discretion in fashioning a restitution order, including a complete accounting of losses to each victim); § 3664(d)(1) ("[U]pon request of the probation officer . . ., the attorney for the [g]overnment, after consulting, to the extent practicable, with all identified victims shall promptly provide . . . a listing of the amounts subject to restitution."); *see also* Fed. R. Cr. P. 32(c)(1)(B) (probation officer must conduct investigation and submit a report containing sufficient information for court to order restitution).  All portions of the report pertaining to these matters are also disclosed to the defendant and the attorney for the government. *See* § 3664(b).

Upon considering this report and additional documentation and/or hearing testimony, as appropriate, *see* § 3664(d)(4), the sentencing court

---

[3] "[J]udicial fact-finding supporting restitution orders does not violate the Sixth Amendment." *United States v. Ingles*, 445 F.3d 830, 839 (5th Cir. 2006) (quoting *United States v. Garza*, 429 F.3d 165, 170 (5th Cir. 2005)).

determines the amount of restitution that the defendant owes, resolving any disputes as to the proper amount or type of restitution by a preponderance of the evidence. *See* § 3664(e). The government bears the "burden of demonstrating the amount of the loss sustained by a victim as a result of the offense," whereas the defendant bears the "burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents." *Id.* "The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." *Id.*

Section 3664 directs that "the court *shall* order restitution to each victim in the *full* amount of each victim's losses as determined by the court and *without* consideration of the economic circumstances of the defendant." § 3664(f)(1)(A) (emphasis added). But, if more than one defendant has contributed to a victim's loss, "the court *may* make each defendant liable for payment of the full amount of restitution or *may* apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." *See* § 3664(h) (emphasis added); *see also United States v. Sheets*, 814 F.3d 256, 260 (5th Cir. 2016) ("[T]he court has the discretion [under § 3664(h)] to find each defendant liable for payment of the full amount of restitution, i.e., joint and several liability among the defendants."); *United States v. Gozes-Wagner*, 977 F.3d 323, 346 (5th Cir. 2020) (same).[4] "The district court's failure to order restitution for others who might have participated in the scheme is of no consequence." *United States v. Arledge*, 553 F.3d 881, 899 (5th Cir. 2008).

_____

[4] A defendant whose restitution award is "joint and several" with others "may seek contribution from his co-conspirators to pay off the restitution award and reduce the amount he personally owes." *United States v. Arledge*, 553 F.3d 881, 899 (5th Cir. 2008).

No. 22-30747

Section 3664(h) also permits courts to "apply a hybrid approach in imposing restitution—frequently employing a combination of the apportionment of liability approach while concurrently making all of the defendants jointly and severally liable." *Sheets*, 814 F.3d at 260–61 (collecting cases).[5] A hybrid approach is an "appropriate mechanism . . . to apply . . . to restitution payments where multiple defendants are held liable for injuries caused by a common scheme." *Id.* at 261–62. Regardless of the apportionment of liability, however, "courts may not award restitution that would result in the payment to the victim of an amount greater than the victim's loss. *Id.* at 260. "Thus, even where liability of each defendant overlaps and the total amount that they are held liable for exceeds the victim's total injury, the MVRA permits the [g]overnment to hold any individual defendant liable for as much as the court ordered as to *that* defendant, but the government may not collect more from all defendants together than will make the victim whole." *Id.* at 261.

## B.

When issues have been preserved for appeal, we review "the legality of a restitution order de novo and factual findings, including the amount of loss incurred, for clear error." *United States v. Johnson*, 94 F.4th 434, 439–40 (5th Cir. 2024).[6] The district court's method of determining loss is

---

[5] *See, e.g.*, *United States v. Scott*, 270 F.3d 30, 52 (1st Cir. 2001) (three co-defendants were ordered to pay restitution for the same loss of $37,970.68 in different amounts: $37,970.68, $8,253, and $7,479 but, because a victim may recover no more than the total loss, "the implication is that each defendant's liability ends when the victim is made whole, regardless of the actual contributions of individual defendants—a rule that corresponds to the common law concept of joint and several liability"); *United States v. Trigg*, 119 F.3d 493, 500–01 (7th Cir. 1997) (affirming restitution orders for full amount of loss made joint and several with co-defendants who had been ordered to pay restitution for some, but not all, of full amount).

[6] "To preserve error, an objection must be sufficiently specific to alert the district court to the nature of the alleged error and to provide an opportunity for correction."

reviewed de novo; however, "clear error review applies to the background factual findings that determine whether or not a particular method is appropriate." *United States v. Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011); *see also United States v. Shah*, 95 F.4th 328, 387 (5th Cir. 2024), *petitions for cert. filed*, (U.S. July 9–10, 2024) (Nos. 24-5032, 24-23, 24-25) (citing *Isiwele*, 635 F.3d at 202). "'[P]reserved error as to the quantum of a restitution award' is reviewed for an abuse of discretion." *Johnson*, 94 F.4th at 440 (quoting *United States v. De Leon*, 728 F.3d 500, 507 (5th Cir. 2013)). An abuse of discretion occurs when a court's "ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. *Johnson*, 94 F.4th at 440 (quoting *United States v. Crawley*, 533 F.3d 349, 358 (5th Cir. 2008)).

Unpreserved objections to a restitution order—i.e., "where the defendant has failed to object to either the amount of restitution recommended in the pre-sentence investigation report or the district court's restitution order, thereby denying the court the opportunity to identify and correct any errors"—are reviewed for plain error. *Sheets*, 814 F.3d at 259 (citing *United States v. Maturin*, 488 F.3d 657, 660 (5th Cir. 2007)); *see also Johnson*, 94 F.4th at 440.

"Under that test, before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 466–67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). "If all three conditions are met, an appellate court may then exercise its discretion

---

*United States v. Ellis*, 720 F.3d 220, 224–25 (5th Cir. 2013) (quoting *United States v. Neal*, 578 F.3d 270, 272 (5th Cir. 2009)); *see also* Fed. R. Cr. P. 51(b) (party may preserve error by informing the court . . . of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that action").

to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (cleaned up). "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" *Olano*, 507 U.S. at 734. With regard to time frame, "it is enough that an error be 'plain' at the time of appellate consideration." *Johnson*, 520 U.S. at 468.

### III. MVRA Applicability— "Covered Offense"

Borino first argues that the offense of which he was convicted, misprision of a felony, in violation of 18 U.S.C. § 4, is not an offense to which the MVRA applies. Specifically, Borino contends that misprision of a felony is not an "offense committed by fraud or deceit," as required by 18 U.S.C. § 3663A(a) and (c)(1)(A)(ii). In support of this assertion, Borino emphasizes that § 4 requires only that the defendant (1) "hav[e] knowledge of the actual commission of a felony cognizable by a court of the United States"; and (2) "conceal[] and do[] not as soon as possible make known the same to some judge or other person in civil or military authority under the United States." *See* 18 U.S.C. § 4. Because Borino did not make this argument in the district court, the plain error standard of review applies. *See, e.g., Shah*, 95 F.4th at 386 (unpreserved assertion that MVRA did not apply because offense was not an "offense against property" reviewed only for plain error).

The federal misprision statute, 18 U.S.C. § 4, expressly requires the government to prove a predicate felony, which here is wire fraud. And, wire fraud, which includes a "scheme to defraud" as an element, is "an offense committed by fraud or conceit" for purposes of the MVRA. *See United States v. Williams*, 993 F.3d 976, 980 (5th Cir. 2021) (offense committed by fraud or conceit "obviously includes wire fraud" in violation of 18 U.S.C. § 1343); *United States v. Ingles*, 445 F.3d 830, 839 (5th Cir. 2006) (establishing wire fraud, in violation of 18 U.S.C. § 1343, requires proof of a "scheme to defraud"); *see also* 5th Cir. Pattern Crim. Jury Instr. 2.06 (instruction for

misprision of felony must include underlying felony's elements); *Id.*, Instr. 2.57 (elements of wire fraud, in violation of 18 U.S.C. § 1343, include scheme to defraud ).[7]

Furthermore, we recently rejected the categorical approach (limiting the court to a consideration of elements) for § 3663A(a) and (c)(1)(A)(ii). *See Shah*, 95 F.4th at 387. In *Shah*, we decided that "committed by fraud or deceit" refers to the way in which some offenses "against property" are committed and concluded that "the district court may look to the facts and circumstances of the offense of conviction to determine if the MVRA authorizes a restitution order." *Shah*, 95 F.4th at 387 (quoting *United States v. Razzouk*, 984 F.3d 181, 186–88 (2d Cir. 2020)). In other words, though the MVRA does not necessarily always apply to misprision of a felony convictions, it can. Indeed, we have applied the MVRA to misprision of felony convictions in a number of cases. *See Johnson*, 94 F.4th at 440–42; *Sheets,* 814 F.3d at 260–62; *United States v. Reinhart*, No. 22-10103, 2023 WL 5346053, *1, 3 (5th Cir. Aug. 16, 2023) (unpublished).

Here, the relevant facts and circumstances of Borino's offense include repeated and multi-year concealments of the Joachims' scheme to defraud. In short, plain error has not been established insofar as Borino claims that the MVRA does not apply, as a matter of law, to his misprision offense of conviction.

## IV. MVRA—"Actual Loss"

In addition to contesting the MVRA's applicability to his misprision offense, Borino argues that the district court's $21,223,036.37 restitution

_____

[7] *See also United States v. Stouffer*, 986 F.2d 916, 928 (5th Cir. 1993) (noting that proving wire fraud, in violation of 18 U.S.C. § 1343, requires proof of "a scheme to defraud, rather than just specific incidents of fraud limited to individual investors" and "scheme" means "a plan or pattern of conduct").

order, which awards the total amount of fees ($21,510,389.60) paid by program participants less the total amount of claims ($287,353.23) paid to program participants between September 2014 and January 2017, violates the MVRA's limitation of restitution to the amount of the victim's *actual* loss.

## A.

The MVRA limits restitution to the *actual loss* directly and proximately caused by the defendant's offense of conviction. *United States v. Mahmood*, 820 F.3d 177, 196 (5th Cir. 2016); *see also Johnson*, 94 F.4th at 441 ("restitution amount imposed must not exceed the victim's 'actual loss'"). The MVRA places the burden on the government to prove a victim's actual loss by a preponderance of the evidence. *See* 18 U.S.C. § 3664(e). But, the sentencing court may shift that burden to the defendant "as justice requires." *Id.*; *United States v. Sharma*, 703 F.3d 318, 325–26 (5th Cir. 2012)

"We have interpreted the [provisions of § 3664(e)] to establish a burden-shifting framework for loss-amount calculations." *Williams*, 993 F.3d at 980. Thus, if the government carries its burden of demonstrating the actual loss sustained by a victim by a preponderance of the evidence, the burden shifts to the defendant to show an entitlement to an offset against the amount of the actual loss. *See, e.g., Johnson*, 94 F.4th 434 (defendant bears burden to establish entitlement to offset); *United States v. Ricard*, 922 F.3d 639, 658–59 (5th Cir. 2019); *United States v. Dickerson*, 909 F.3d 118, 129–30 (5th Cir. 2018) (after government establishes amounts for restitution, burden shifts to defendant to prove inaccuracy of loss calculation); *Sharma*, 703 F.3d at 325–26 (burden shifts to defendant to establish entitlement to restitution credit); *United States v. Franklin*, 595 F. App'x 267, 272 (5th Cir. 2014) (burden on defendant to prove entitlement to and value of credit); *see also Johnson*, 94 F.4th at 445 (Elrod, J., concurring) (emphasizing defendants' failure to counter the information in the PSR report or to suggest entitlement

to a greater offset for bona fide services). If the defendant satisfies his burden, "the government can rebut with additional evidence." *Ricard*, 922 F.3d at 659 (quoting *United States v. Mathew*, 916 F.3d 510, 521 (5th Cir. 2019)).

The district court's "finding regarding the amount of loss is a factual finding [reviewed] for clear error." *Williams*, 993 F.3d at 980; *Mathew*, 916 F.3d at 516; *Id.* ("loss-amount finding is not clearly erroneous if it's plausible in light of the record as a whole") (quoting *United States v. Harris*, 597 F.3d 242, 250 (5th Cir. 2010) (cleaned up)). But, the question of *how* the court calculated the loss is a question of law that we review de novo. *See United States v. Klein*, 543 F.3d 206, 214 (5th Cir. 2008) ("[B]efore assessing the court's loss estimate, we 'first determine [ ] whether the trial court's method of calculating the amount of loss was legally acceptable[.]'") (quoting *United States v. Olis*, 429 F.3d 540, 545 (5th Cir. 2005)).

In deciding the amount of loss, "a district court may adopt the findings of the PSR without additional inquiry if those facts have an evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information is materially unreliable." *Dickerson*, 909 F.3d at 129; *see also Williams*, 993 F.3d at 981 (quoting *Sharma*, 703 F.3d at 323) ("[D]istrict court may rely on actual-loss amounts in the PSR if the amounts have an adequate evidentiary basis and remain unrebutted by the defendants.") (cleaned up)).

## B.

Notably, the specifics of Borino's "actual loss" challenge have evolved. He has argued that the district court's restitution order fails to comply with the MVRA because, he contends, it awards compensation without having required the government to prove that the Classic 105 Program participants suffered actual financial losses and the amounts of those losses. He also argues that the district court's restitution order

improperly compensates persons who suffered *no* actual financial loss as result of the underlying criminal conduct, and were not harmed for purposes of the MVRA, because tax savings that participants in the Classic 105 Program received exceed the amount of administrative fees that they paid to TTFG.

Having otherwise accepted the government's position that the fees paid by the Classic 105 Program participants (less the amount of medical claims paid by TTFG) are compensable actual losses, for purposes of the MVRA, the district court considered Borino's "tax savings" argument at the March 30, 2023 restitution hearing. In the end, the district court rejected Borino's position, reasoning that the burden of proof had shifted to him and, in the absence of supporting evidence, his assertions were speculative.

On appeal, the government reiterates its assertion that Borino has neither quantified nor provided evidentiary support for the restitution credit that he seeks. As an additional basis for affirmance, the government argues that there is no legal basis for concluding that Borino is entitled to a restitution credit for his role in providing illegitimate tax breaks that (1) plan participants received unwittingly and (2) exposed their recipients to adverse financial consequences.[8]

Responding to the government's assertion that "net-financial-neutrality" in this case is merely speculative, Borino contends that a detailed accounting of each individual participant's specific tax "offset" is unnecessary. In essence, Borino argues that because Classic 105 Program participants *may* have realized benefits in the form of tax savings (based on

---

[8] The government, citing 26 U.S.C. § 6501(c)(1), has suggested, without further analysis, that the IRS could still seek to collect any delinquent taxes from the plan participants.

*improperly* underreported tax data), their loss amount (fees paid to TTFG) is entirely offset by the amount of taxes that they *may* not have paid to the IRS (and any other relevant taxing authority).[9]

We disagree. Borino offers no legal authority supporting his positions. Instead, he primarily points to misrepresentations regarding the favorable tax consequences of participation in the Classic 105 Program that *TTFG personnel* made to secure the pawns necessary to the success of their scheme.

Additionally and, in any event, it is undisputed that TTFG, in marketing the Classic 105 Program, promised participants two things in exchange for their payment of TTFG's fees: (1) medical reimbursement accounts that were fully funded (until the employee-participant's death) by third-party sources; and (2) *legitimate* reductions of taxable income. It is also

———————————————

[9] Borino now maintains that the relevant dispute is one of law, not evidence. Specifically, he argues, in his reply brief:

> Contrary to the government's framing, that obvious defect does not boil down to a mere evidentiary dispute over how much eligible victims were harmed or a proof issue about the precise valuation of individual "offsets" for each of the thousands of participants. To the contrary, the defects at issue ultimately boil down to a legal dispute over whether the MVRA authorized restitution to be paid to individuals who everyone agrees suffered no actual financial loss as a result of this crime.

> \* \* \*

> There was no offset to calculate because, as the government acknowledges, there was no loss to participants to begin with. Thus, determining loss amount does not require some unknown equation for each victim consisting of exact fees paid minus exact taxes withheld in the same paycheck the answer to that math problem is zero. Employee paychecks remained the same. And that's all that matters[.] If an individual did not suffer a financial harm, that person is not an eligible victim for MVRA purposes, and any restitution award ordered to them exceeds what is permitted by statute.

undisputed that TTFG did not fulfill its end of the bargain—program participants paid TTFG's fees but received neither of the two things that TTFG promised. Accordingly, unless and until TTFG issues refunds, the program participants' actual losses certainly include the amount of fees that TTFG collected from them.

Nor is that fact impacted by whether (or not) Classic 105 Program participants received *and* retained actual tax savings (in the form of reduced tax obligations) as a result of their participation in the Classic 105 Program. *If* they did, which cannot be determined on the record before us, that means the fraudulent, criminal conduct of *TTFG personnel* caused—albeit through the unwitting Classic 105 Program participants—an additional, entirely separate, harm to yet another victim—the IRS.[10]

And the final allocation of the financial burden—vis-à-vis the plan participants and the IRS—of any additional, separate harm to the IRS is a matter between the *program participants and the IRS* that is outside the scope of *this* proceeding. In other words, *if* the program participants actually realized reduced tax obligations as a result of their participation in the Classic 105 Program, i.e., paid less taxes than they should have, but did not amend their returns and pay the additional tax amount owed once the true nature of the program was revealed, any failure by the IRS to collect the additional amounts from the program participants does *not* inure to the benefit of one of the persons whose fraudulent, criminal conduct is ultimately responsible for *both* harms.[11]

_____

[10] It is unclear whether taxing authorities in addition to the IRS were adversely impacted by the Classic 105 Program. The reference to the IRS here does not assume or suggest that others were not.

[11] *See also* 18 U.S.C. § 3664(f)(1)(B) ("In no case shall the fact that a victim has received or is entitled to receive compensation with regard to a loss from insurance or any

No. 22-30747

Certain health-care fraud cases discussing the use of a burden-shifting framework to determine the "actual loss" amount that the defendant must pay in restitution to a victim of fraudulent billing, e.g., Medicare or a health insurance company, help demonstrate why this is true. As explained in *Sharma*, 703 F.3d at 324, "an insurer's actual loss for restitution purposes must not include any amount that the insurer would have paid had the defendant not committed the fraud." Otherwise, the restitution award exceeds the victim's actual loss and thus exceeds the maximum statutory amount. *Id.* at 322, 324. Employing a burden-shifting framework, where appropriate, ensures that the restitution award is thus properly limited.

In *United States v. Klein*, 543 F.3d 206, 208–09 (5th Cir. 2008), for example, the defendant doctor billed the insurer at the rate for a physician-administered injection when the patient actually had self-administered the injection at home. So the bill that was submitted for payment was fraudulent and restitution was owed. But the amount that the defendant doctor was ordered to pay back to the victim insurer as restitution for the fraudulent billing—i.e., the insurer's "actual loss"—did *not* include the medication portion of the bill because the insurer would have paid that amount to the defendant provider regardless of who (the physician or the patient) administered the injection. In other words, because the otherwise fraudulent bill also included amounts for a medically-necessary product for which the victim nevertheless was obligated to pay the defendant, the amount that the

––––––––––––––––––––

other source be considered in determining the amount of restitution."); § 3664 (j)(1) ("If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.").

defendant owed to the victim, as restitution, was less than the (billed) amount that the victim had paid to the defendant.

The same, however, was not true in *Sharma*. There, the defendants had billed "trigger point injections" at the higher rate applicable to "facet-point injections." The resulting restitution obligation to insurers was *not* lessened by the amount otherwise payable for trigger-point injections, however, because the injections were determined to have been a "revenue stream" for the defendants, *not* "legitimate, medically necessary treatments for which the insurers would have paid in the absence of fraud." *Sharma*, 703 F.3d at 324. Similarly, in *United States v. Edet*, No. 08-10287, 2009 WL 552123, at *3 (5th Cir. Mar. 5, 2009) (per curiam) (unpublished), the panel affirmed the district court's denial of a restitution credit for the value of wheelchairs that the defendant had provided to patients, reasoning that the defendant had not shown that Medicare would have paid for the wheelchairs in the absence of fraud.

The court's analyses in *Sharma*, *Klein*, and *Edet* reflect that the loss amount that a defendant must pay in restitution is lessened by the amount of value, if any, that the defendant "bestowed upon" the person(s) otherwise harmed by his offense conduct. *See De Leon*, 728 F.3d at 506 ("[W]e have shifted to the defendant the burden to show any entitlement to a credit for value bestowed on the victim."); *United States v. del Carpio Frescas*, 932 F.3d 324, 331 (5th Cir. 2019) ("[T]he defendant bears the burden of showing that he is entitled to a reduction based on returns he made to victims.") (emphasis added). But, importantly, "value" is limited to amounts for which the *defendant* is otherwise *legitimately* entitled to receive payment from the victim. *See Mathew*, 916 F.3d at 522 (quoting *Mahmood*, 820 F.3d at 194) (offset against actual loss amount limited to "legitimate services" for which Medicare would have paid but for the fraud); *see also* U.S.S.G. § 2B1.1, cmt. n. 3(D)(i) ("Credits Against Loss.—Loss shall be reduced by . . . the money

21

returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.").[12]

Describing the court's analyses in *Klein*, *Sharma*, and *Edet* in more general terms, the deduction sought by the defendants in those cases, for purposes of calculating the final "actual loss" restitution amount, was warranted in *Klein* (unlike in *Sharma* and *Edet*) because the victim insurer and the defendant doctor each had a payment obligation to the other. Thus, in *Klein*, the higher amount that the defendant (doctor) owed to the victim (insurer) was offset—reduced—by the lesser amount that the victim (insurer) owed to the defendant (doctor).

Here, in contrast, the *program participants* have no financial obligation to Borino because Borino did not provide the program participants with anything of value—a legitimate product or service—for which he, despite his misprision, is still entitled to compensation.[13] But there is no sum for the court to subtract from—or offset against—the debt that Borino owes to the program participants. Yet, by arguing that the program participants have no actual loss, Borino essentially asks the court to permit him to tell the

---

[12] *See Sharma*, 703 F.3d at 325 & n.29 (noting that rationale underlying actual loss calculation utilized to determine the pertinent Sentencing Guidelines range of imprisonment applied equally to the restitution determination).

[13] Additionally, this argument fails to appreciate the scope and nature of the scheme to defraud. The Classic 105 Program was supposed to create legal tax benefits. Instead, as implemented, it manufactured a tax and unemployment benefit morass for the victims. Because there were no contributions, loans, or life insurance policies, the plan that TTFG personnel marketed did not exist. The employer-clients and employee-participants were defrauded into paying for that false plan, and the resulting harm—and the compensable restitution—relates solely to the fees they paid for it.

participants, relative to the fees that *he* owes to *them*: "Take what *I* owe *you* out of what *you* (might) owe the *IRS*."[14]

Borino's logic is flawed. His obligation to pay restitution to the program participants for unearned fees is not canceled or forgiven simply because the program participants may themselves have (thus far) paid less taxes to the IRS than were actually owed. To conclude otherwise would provide him with a monetary benefit to which *he* is in no way entitled. Accordingly, Borino's second assertion of error, like his first, is unavailing.

## V. MVRA—"Causation"

Borino's third, and final, challenge is directed to the district court's "causation" determination. Specifically, he contends that the district court erroneously ordered restitution for victim losses in excess of those directly and proximately caused by *his* offense of conviction, i.e., misprision of a felony, such that his restitution order exceeds the maximum amount allowed by statute.

The MVRA's causation requirement is found in its definition of the term "victim"—i.e., "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *See* § 3663A(a)(2). "A person is directly harmed by the commission of a federal offense where that offense is a but-for cause of the harm." *Mathew*, 916 F.3d at 519; *In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011) (footnotes omitted) (referencing identical causation language in the Victim and Witness

---

[14] Conversely, the offset in *Klein* accomplished what otherwise would happen if the defendant had told the victim: "I'll take it out of what I owe you" or the victim had told the defendant: "Take it out of what you owe me." *Cf.* La. Civ. Code art. 1893 ("Compensation takes place by operation of law when two persons owe to each other sums of money . . . and these sums or quantities are liquidated and presently due. In such a case, compensation extinguishes both obligations to the extent of the lesser amount."); *Id.* art. 1984 ("Compensation takes place regardless of the sources of obligation.").

Protection Act (VWPA), 18 U.S.C. § 3663). "A person is proximately harmed when the harm is a reasonably foreseeable consequence of the criminal conduct." *Fisher*, 640 F.3d at 648.

This provision has been interpreted to mean that "a defendant sentenced under the provisions of the MVRA is only responsible for restitution for the conduct underlying the offense for which he has been convicted." *United States v. Mancillas*, 172 F.3d 341, 343 (5th Cir. 1999); *Mathew*, 916 F.3d at 516; *see also Hughey v. United States*, 495 U.S. 411, 420 (1990) ("[L]oss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order."). But, when that offense "involves as an element a scheme, conspiracy, or pattern of criminal activity," the defendant's restitution obligation extends to "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *See* § 3663A(a)(2); *Maturin*, 488 F.3d at 661 (quoting § 3663A(a)(2)).

A defendant who is convicted of conspiracy may be held jointly and severally liable for the full amount of the loss due to a conspiracy. *United States v. Gozes-Wagner*, 977 F.3d 323, 346 (5th Cir. 2020); *see also United States v. King*, 93 F.4th 845, 854 (5th Cir. 2024), *cert. denied*, No. 23-7592, 2024 WL 4426928 (U.S. Oct. 7, 2024) ("Under the MVRA, members of a conspiracy may be 'held jointly and severally liable for all foreseeable losses within the scope of their conspiracy regardless of whether a specific loss is attributable to a particular conspirator.'") (quoting *United States v. Ochoa*, 58 F.4th 556, 561 (1st Cir. 2023)). However, "[a] defendant who participates in a conspiracy, but who pleads to a narrower charge may not be ordered to pay restitution for the entire amount of loss caused by the conspiracy." *United States v. Bailey*, 800 F. App'x 216, 219 (5th Cir. 2020) (per curiam).

No. 22-30747

The Parties' Arguments

In support of his causation challenge, Borino argues the district court's restitution order impermissibly requires him to pay restitution for "harms caused by the Classic 105 Program more generally, or the Joachims' conspiracy as a whole," rather than his own "admitted acts of concealment." More particularly, Borino argues that the conduct underlying his misprision offense—acts of concealment—is limited to three conversations—two in December 2014 and one in October 2016—referenced in his factual basis. These three communications, he maintains, were not but-for causes of the entirety of the approximately $21.5 million fees included in his restitution order. Nor, he maintains, would that amount have been foreseeable to him on any of the three identified dates. Should we not be convinced by one or both of his other arguments that he owes *no* restitution, Borino contends that we must vacate the district court's restitution order and remand for a determination of the fee expenditures, if any, that were directly and proximately caused by the three communications that he has identified.

The fatal flaw in Borino's position, the government argues in response, lies in his assertion that the "conduct underlying his misprision offense" is limited to three telephone calls. Regarding this point, the government contends that the record instead reveals the pertinent offense conduct to be Borino's continuous promotion, in his role as TTFG's Executive National Marketing Director, of a program whose terms he knew to be false and fraudulent during the entirety of the September 2014 through January 2017 time period set forth in the one-count bill of information to which he pleaded guilty. And this conduct was the direct and proximate cause of the loss of the approximately $21.5 million of participant fees for which restitution was ordered, the government maintains, because Borino's continuing concealments of the program's falsities, given his position and role at TTFG, enabled it to succeed as long as it did.

25

As support for its position, the government cites two cases from our sister circuits as persuasive authority—*United States v. Marino*, 654 F.3d 310 (2d Cir. 2011), and *United States v. Sosebee*, 419 F.3d 451 (6th Cir. 2005). In *Marino*, the defendant pleaded guilty to misprision of a felony based on a fraudulent scheme involving Bayou Hedge Fund Group ("Bayou"), a classic Ponzi scheme masked as a group of domestic and offshore hedge funds that, upon unravelling in 2005, caused approximately $200 million in investor losses. Ordering Marino to pay restitution in the amount of $60 million, the district court reasoned that the amount of restitution was appropriate because his role was "significant and key to the perpetuation of the fraud." Affirming the restitution order, the Second Circuit explained, in pertinent part:

> [W]e may presume that had [Marino] disclosed the crime in a timely fashion, no investor would have invested fresh cash in the Ponzi.
>
> For that reason, [Marino] cannot claim that his crime was not a cause in fact—a "but for" cause—of the investors' losses. [Marino] was one of four individuals who knew of and should have revealed the Bayou fraud, but did not. During the relevant time period—between January and August of 2005—investors entrusted over $60 million with Bayou in reliance on the false representation that Bayou was a legitimate investment firm that was audited by an independent financial accounting firm. But for [Marino]'s role in affirmatively concealing the falsity of this representation, these investors would certainly not have invested in Bayou, as no reasonable investor would invest in a known Ponzi scheme.

*Marino*, 654 F.3d at 322.

In *Sosebee*, the defendant pleaded guilty to misprision of a felony based on a fraudulent scheme involving orders placed with Upjohn, a pharmaceutical manufacturer. The district court imposed restitution in the

No. 22-30747

full amount of the victim pharmaceutical company's losses. The defendant appealed, claiming that the pharmaceutical company was not a victim of the offense to which she had pleaded guilty—misprision of a felony. The Sixth Circuit rejected her argument, reasoning:

> The record supports a determination that Sosebee knew of the fraud while the conspiracy was in progress, perhaps even from its beginning . . ., and concealed the scheme while it was in progress. Had her knowledge and concealment come only *after* the scheme came to an end, she would have been guilty of no more than being an accessory after the fact. This, however, was not the case here. *But for* her continuing concealment of the losses being incurred by Upjohn, those losses might have been avoided altogether or stemmed to a significant degree, or—in the alternative—Upjohn might have had a realistic chance to recoup assets . . . that apparently have since been dissipated. We have no hesitation in concluding that Sosebee's misprision of the felony involved in this case was a direct and proximate cause of some or all of the victim's losses, even if it was not the sole cause. It follows that the restitution order was legally appropriate under the Act.

*Sosebee*, 419 F.3d at 459 (emphasis in original).

The rationale supporting the restitution orders in *Marino* and *Sosebee* similarly applies to Borino's conduct, the government argues, such that he should be held responsible for the entirety of the losses that occurred during the time period—between September 2014 and January 2017—charged in his bill of information and reflected in the district court's restitution order.[15]

---

[15] The government reasons:

> Both the factual basis and the PSR make clear Borino's involvement in the fraud scheme. He was the primary point of contact for obtaining an opinion letter that TTFG used in its marketing materials. The opinions contained in the letter were based on false representations about

No. 22-30747

## Sufficiency of the Record

Unfortunately, we do not have the benefit of the district court's explicit evaluation of the merits of Borino's causation argument because he raises it for the first time on appeal. Indeed, during the entirety of the time that his case was before the district court, Borino never challenged the existence of the requisite causal links between the conduct underlying his offense and the extent of the $21.5 million proposed by the government and included in the district court's restitution order. Hence, our review of the district court's restitution order, relative to causation, is for plain error. In other words, to prevail on appeal, Borino's argument must reveal a clear or obvious flaw in the district court's causation determination.[16]

_____

how Classic 105 operated. Moreover, Borino was the Executive National Marketing Director for TTFG. As such, he "was involved in developing TTFG's marketing strategy, materials, and presentation[s] for Classic 105." He was involved intimately with recruiting prospective clients and answering the questions of enrollees. In that capacity, Borino conveyed and both permitted and encouraged others to convey material falsehoods about Classic 105 to prospective clients in an effort to convince them to enroll in the program and pay the administrative fees.

Borino was one of a select few who knew of and should have revealed the fraud, and he failed to do so. Borino's active concealment occurred during the commission of the fraud scheme, not after the fact. But for his role in affirmatively concealing the falsity of the Classic 105 program—and his continued marketing of a program whose terms he knew to be false and fraudulent—the fraudulent Classic 105 scheme likely would have been unsuccessful. . . . His actions constituted "textbook fraud or deceit," from which those enrolled in Classic 105 suffered. Consequently, the district court accurately concluded that Borino's conduct caused the victims' losses.

[16] Nor did Borino ask the district court to exercise its discretion, pursuant to § 3664(h), to hold him liable for a lesser amount of restitution than Denis Joachim (for the relevant time period) based on the level of his contribution to the victims' losses and/or his economic circumstances.

28

Given the mandatory nature of the restitution authorized by the MVRA, the statute's express "direct" and "proximate" causation requirements, and the substantial restitution order sought by the government, Borino's failure to raise any causation deficiencies while in district court is hardly an insignificant omission. Even so, in this instance, we are able to properly assess Borino's arguments without the necessity of remanding the matter to the district court for further consideration or a supplemental statement of reasons for judgment.

This is true for a number of related reasons. Section 3664, importantly, requires the government to demonstrate the amount of the loss sustained by a victim, "*as a result of the offense,*" by a preponderance of the evidence. 18 U.S.C. § 3664(e). The statute also requires the district court to resolve any disputes as to the amount of restitution, and order restitution to each victim in the full amount of each victim's losses. § 3664(e), (f)(1)(A). And though Borino did not present a causation-based challenge to the restitution order sought by the government, he also did not stipulate to it. Therefore, the district court was required to consider causation in determining the appropriate parameters of its restitution order.

Additionally, the record set forth sufficient evidence and legal authority to permit the district court to make the requisite prima facie determination of causation. Also, though perhaps not to the same extent and detail that would have occurred if Borino had challenged the government's evidence and/or legal theory, the record reveals that the court in fact did consider and determine that the requisite causal link exists.

---

No. 22-30747

Analysis

As explained above, Borino's causation challenge is premised on his assertion that "the conduct underlying his misprision offense"—acts of concealment—is limited to three individual conversations referenced in his factual basis. These three communications, he maintains, were not a but-for cause of the entirety of the approximately $21.5 million fees included in his restitution order. Nor, he contends, would the full extent of the restitution ordered have been foreseeable on those "three occasions."

At the outset, we note that it is far from evident that the district court, in confecting its restitution order, considered the conduct underlying Borino's misprision offense to be limited to the three conversations that Borino references. To the contrary, it is apparent from the record that the district court adopted the government's delineation of Borino's offense conduct. Nor, moreover, are we convinced that the district court was *required* to calculate restitution based solely on the three conversations that Borino belatedly argues delimit his restitution obligation.

Indeed, the record clearly demonstrates that the district court's restitution order is based upon information obtained from sources that the restitution statutes direct and/or authorize the court to consider. And, finally, the record demonstrates the existence of the requisite evidentiary support for the  approximately $ 21.5 million that Borino was ordered to pay as restitution. Accordingly, we find no plain error.

We reach these conclusions for a number of reasons.

A.

As an initial matter, we note that Borino's June 29, 2021 Bill of Information for Misprision of a Felony does not simply allege three discrete acts of concealment. Rather, it alleges, in pertinent part:

> Beginning at a time unknown, but not later than in or about September 2014, and continuing through at least on or about January 10, 2017, . . . the defendant, Joseph Anthony Borino, having knowledge of the actual commission of a felony cognizable by a court of the United States, to wit, wire fraud, as that conduct is set forth in Counts 1, 7, and 8 of the Superseding Indictment in Criminal Number 19-237, Section "D" (E.D. La.), did conceal the same by knowingly misleading subordinates and prospective clients concerning the actual operation of the Classic 105 program and did not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, in violation of title 18, United States Code, Section 4.

Notably, the referenced Superseding Indictment charges a conspiracy to commit wire fraud, beginning not later than August 2012 and continuing until on or about January 10, 2017, as well as two substantive offenses of wire fraud. Additionally, the temporal period of the offense charged in Borino's bill of information is itself a "continuing one" that extends a number of months after the last of the three conversations identified by Borino. In short, the bill of information charged Borino with years of knowing acts of concealment that enabled a fraudulent scheme—designed to generate a constant stream of unlawful proceeds from its victims—to flourish.

Additionally, contrary to Borino's suggestion otherwise, the July 8, 2021 factual basis does not purport to provide a complete report of the entirety of the acts of concealment underlying his misprision offense. In fact, the ten-page document expressly states that it is "*not* intended to constitute a complete statement of all facts known by . . . Borino and/or the

[g]overnment" and, instead is only "a minimum statement of facts intended to prove the necessary factual predicate for [Borino's] guilty plea." (Emphasis added).

Consistent with that limiting statement, the factual basis expressly and unambiguously characterizes the two December telephone conversations as "*examples*" of representations that Borino made to prospective enrollees "on *multiple* occasions" after receiving a November 2014 email from Denis Joachim stating, in part, that "loans and credit life or who[le] life policies are not part of the Classic 105 program." (Emphasis added). Similarly, during the July 8, 2021 re-arraignment hearing, counsel for the government unequivocally characterizes the aforementioned events as "examples" of Borino's acts of concealment during the relevant time period.

## B.

Significantly, the record before the district court, as of the date of Borino's restitution hearing, is not limited to the factual basis and bill of information. To the contrary, the positions taken by the government and the probation officer regarding the appropriate extent of Borino's restitution obligation and, importantly, the facts supporting those positions, are clearly and thoroughly articulated in the case materials that district courts are instructed to consider in determining an appropriate restitution order under the MVRA. *See* § 3664(a) (probation officer to obtain and provide information sufficient for the court to exercise its discretion in fashioning a restitution order, including a complete accounting of losses to each victim); § 3664(d)(4) (court to decide restitution after reviewing the probation officer's report, and considering additional documentation and/or hearing testimony, as appropriate).

In this matter, those materials include (1) the factual basis; (2) the initial pre-sentence investigation report and the government's objection

thereto; (3) the final pre-sentence investigation report; (4) sentencing memoranda (with exhibits); and (5) restitution memoranda (with exhibits). As outlined below, these documents consistently and repeatedly communicate and explain the government's and the probation officer's positions regarding restitution—i.e., that both Borino and Denis Joachim should be held responsible for the full amount of the participant fees (approximately $25 million) generated during the entirety of TTFG's fraudulent scheme—to the district court.

1. Factual Basis

The July 8, 2021 factual basis provides pertinent information regarding Borino's role at TTFG, awareness of key aspects of the program, and conduct: (1) "As TTFG's [Executive National] Marketing Director,[17] Borino primarily handled and resolved issues or problems [that] agents, prospective clients, and enrolled clients encountered"; (2) "TTFG sales agents were required to . . . participate in regular calls with Borino, Denis Joachim, and other TTFG employees. The trainings and calls focused on approved methods for marketing Classic 105 and frequently concerned matters related to federal tax laws"; (3) "Borino told prospective customers, and caused his subordinates to tell prospective customers, that TTFG would arrange for the lender to fund the customer's account, which was held at TTFG's home office, directly, to avoid having to endure the excess paperwork inherent in multiple transactions (i.e., a contribution flowing from the employee to the employer to TTFG and a loan flowing from a lender

––––––––––––––––––––––––––––

[17] The factual basis refers to Borino's title as "National Executive Marketing Director." This appears to be a drafting oversight as other case materials identify Borino as TTFG's "Executive National Marketing Director." Additionally, the factual basis and other materials reflect that another TTFG employee held the title of "National Marketing Director."

to the employee)"; (4) "TTFG had approximately thirteen (13) employees and at least fifty-six (56) independent contractors who acted as sales agents for TTFG"; (5) "TTFG and its employees and agents, acting at the direction of Denis Joachim, Donna Joachim, and Borino, represented that contributions, fees, benefits received, and costs paid would be tax exempt (i.e., calculated and made with pre-tax dollars), thereby reducing the employee-participants taxable income"; (6) "The [g]overnment would prove . . . that Borino had knowledge of the actual commission of events that constituted . . . wire fraud."

### 2. Initial Pre-Sentence Investigation Report and Sentencing Objection

When the initial version of the PSR (disclosed on June 28, 2022) declared Borino's loss amount to be $519,420.78, the government promptly filed an objection, on July 12, 2022. Therein, the government argued:

> Based on the nature of Borino's involvement in the Classic 105 program and the breadth of his misprision . . . he should be held responsible for the full amount of the fraud that TTFG executed"—$25,543,340.70.

### 3. Final Pre-Sentence Investigation Report

After considering the government's sentencing objection—to which Borino did not respond—the probation officer amended the PSR, on September 13, 2022, to reflect a loss amount of $25,543,340.78, representing the total amount of fees that TTFG collected from employer-clients and employee-participants enrolled in the Classic 105 Program.[18] The PSR was

---

[18] The reference to $25,543,340.78, rather than $25,543,340.70, in Paragraph 86 of the final PSR appears to be the result of a typographical error. Although not disclosed to the parties, the probation officer's September 13, 2022 sentencing recommendation accompanied the final PSR. Though characterizing the victims' losses as not yet fully ascertainable, the probation officer recommended, consistently with the statements in the final PSR, that the court impose restitution in the amount of at least $25,543,340.70, with

likewise amended to state: "Borino is jointly and severally liable with Denis Joachim, TTFG and others." *See* PSR, ¶¶48, 83. The PSR also includes several pages describing TTFG's fraudulent scheme and Borino's role and knowledge in connection therewith.

### 4. Sentencing Memoranda

Prior to the November 1, 2022 sentencing hearing, the parties submitted sentencing memoranda. Responding to Borino's September 15, 2022 memorandum, which requested a downward sentencing variance from his 21–27 months' range of imprisonment, the government did not take a position regarding the sentence that Borino should receive. But, to ensure "that the Court [could] accurately understand Borino's role at TTFG and involvement in and awareness of its pervasive fraud scheme," the government's September 19, 2022 response provided a three-page discussion of—

(a) Borino's "close connection to Denis Joachim" (the two have worked together at two different companies and are long-time, close friends with Borino's having been the best man at Joachim's wedding);

(b) Borino's "role at TTFG" (Borino was TTFG's "Executive National Marketing Director" and "second-in-command"; "knew 'all parts' of the Classic 105 program" and "was involved in developing TTFG's marketing strategy, materials, and presentation for Classic 105"; "was responsible for all marketing performed by TTFG and its sales agents, and [] ran the weekly sales training conference calls with the agents"; and acted as

---

Borino's being jointly and severally liable with Denis Joachim, TTFG and others, but not obligated to pay after the sum of the amount paid by all defendants "has fully covered all of the compensable injuries."

Denis Joachim's "buffer" by "answering prospective customers' questions that lower-level sales agents could not");

    (c)   the "frequency and specificity of the information [Borino] received detailing TTFG's illegitimacy"; and

    (d) Borino's "pervasive and unyielding dedication to perpetuat[ing] the illegitimacy despite his knowledge otherwise" (Borino addressed inquiries from "potential customers and critics question[ing] (accurately) TTFG's legitimacy and legality"; "was among those responsible for responding to . . . regulators conduct[ing] investigations and audits of Classic 105"; and "serv[ed] as the primary point person" regarding an opinion letter that TTFG sought from a lawyer in 2016 "regarding TTFG's legitimacy").

The government's memorandum was accompanied by several exhibits. These included lists of the Classic 105 plan participants and the fee amounts paid by them; a number of Borino's email communications, between November 5, 2012 and September 2016, with clients, independent/subordinate sales agents, and/or Dennis Joachim; and a transcript of a January 5, 2016 recorded meeting that Borino had with an undercover federal (IRS) agent posing as a prospective independent sales agent.

The email communications reflect, among other things, the following: (1) a February 2014 email acknowledging that the promised third-party financing had not been obtained, i.e., "until we finalize Wall Street monies"; (2) multiple email communications reporting expressions of concern/queries regarding the legality and financial viability of the TTFG program and Borino's responses, e.g., (a) "Obviously, they have not done the[ir] homework." and "Blue Coast has had their experts and people they know who have written IRS codes look at this program and they have given their blessing." (March 2014); (b) "Until he understands how the plan really

works he will have concerns." (Oct. 2014); (c) "There is no convincing someone who has already made up their mind. It is now an ego situation of not wanting to be wrong after telling so many people it was a scam." (Nov. 2014); (d) "Roth[,] what he doesn't know and we will not tell him is we pay off loan and NONE of his BS applies." (March 2015); (e) Regarding query about employees' loan documents: "None of his points are valid because from the over payment of fees[,] the terminated life insurance contracts always get paid.  Any more than that and we get into proprietary info that will never be revealed and is not need to know." (June 2015);  (3) a September 2014 email referencing TTFG having "not made any deals with any banks in state" and Denis Joachim asking Brent Silva: "Why would you say we don't have any banks to anyone in the field." (Sept. 2014); and (4) Denis Joachim asking Borino to "get with" someone whose employees have questions about some loans being "cash collateralized" and some being "collateralized" by a life insurance policy. (May 2015).

The January 5, 2016 transcript reflects, among other things, Borino's telling the agent that he is Denis Joachim's "second in command";  that the reductions taken pursuant to the Classic 105 Program "[a]ffect[] FICA, Medicare, and Social Security";  that "Wall Street banks provide loans";  that "we make sure [the loans] are guaranteed some sort of way . . . could be an annuity [or] life insurance policy";  that "[t]here are a number of different instruments we can use to guarantee it";  that "I'm just showing you how legit this thing is.";  that "I learned this program like the back of my hand"; that "I—we have nothing to hide.  We've got all our ducks in a row.";  and that prospective clients can be told "this company has all their ducks in  a row, they've been to the IRS."  Borino also referenced "my area managers" in various states who have "enrollment team[s] under them" and, in describing the Classic 105 Program, made an analogy to "a reverse mortgage."  Finally, he agreed that his "main role [was] to deal with people

like [the purported prospective sales agent] that are coming in and bringing in clients," adding "then, as I groom you, I may give you to one of my area managers."

### 5. Restitution Memoranda

The government's January 31, 2023 restitution memorandum requests that the court impose a restitution order against Borino in favor of the employer-clients and employee-participants enrolled in the Classic 105 Program—the victims of the fraudulent scheme that Borino concealed—in an amount equal to that ordered against Denis Joachim ($24,888,528.11), and that Borino be jointly and severally liable with Denis Joachim with respect to the restitution award.  The memorandum explains the government's position in detail, i.e., that the total amount of the victims' losses are equal to and based on the total amount of fees that employer-clients and employee-participants paid to TTFG during the time period charged in the indictment. Finally, the amount of $24,888,528.11 is explained to be the total amount of fees paid to TTFG ($25,265,444.21) less the amount that TTFG paid to plan participants for submitted claims ($376,916.10).

Alternatively, recognizing that Borino pleaded guilty to a shorter time period ("September 2014, and continuing through at least on or about January 10, 2017"), the government reports that, if the court were to conclude that the temporal scope of the harm for purposes of restitution are the dates set forth in the bill of information, the total fees that TTFG received during that period were approximately $21,510,389.60, and the amount of claims paid was approximately $287,353.23. Therefore, the amount of restitution due and owing—fees received less claims paid—would be $21,223.036.37.

In addition to repeating much of the same information provided in the September 19, 2022 sentencing memorandum regarding Borino's

background and role at TTFG, and attaching the same documents as exhibits, the restitution memorandum (referencing information set forth in the PSR) reiterates:

> Based on the representations made by Borino, his subordinates, and the rest of TTFG, over 350 employer-clients and 4,000 employee-participants enrolled in Classic 105. TTFG collected approximately $25,543,340.70 in administrative fees from its employer-clients and employee-participants—all victims in the scheme—during its heyday, approximately 2013 until January 2017. *See* Doc. No. 76 at 6-8; Doc. No. 103 at 30, 33 n.1."

> By this point, the Court is well aware that TTFG was a complete sham. Rather than functioning like an actual medical reimbursement program, TTFG commingled assets, paid what few claims were made out of administrative fees, and failed to back stop the program with contributions, loans, and insurance policies as they claimed. *See* Doc. No. 103 at ¶¶ 32-35, 43-44. As predicted in numerous blogs, web forums, and emails to Borino, the "contributions" were merely paper transactions that never occurred. They could not take place because TTFG never obtained a single loan or developed a single relationship with a financial institution to provide loans to offset the contributions. Similarly, TTFG did not secure any life insurance policies to collateralize loans.

> Borino knew these facts because he was told so often. *See, e.g., id.* at ¶¶ 73-74; *see also* Ex. 12 (0559754) (February 25, 2014), Ex. 13 (0242718) (September 2014), Ex. 14 (0245753) (August 2016 email noting that the "bank program is not ready yet"). Nevertheless, Borino repeatedly, and in close proximity to his being told otherwise, continued to represent to his subordinates and to prospective customers that TTFG was legitimate and had funding from legitimate sources. *See* Doc. No. 103 at ¶¶ 73-75. Borino not only knew the Joachims were committing fraud and did not make it known to others, he

39

actively "attempted to conceal the information." *Id.* at ¶ 73. Nevertheless, Borino remained an enthusiastic and vocal supporter and leader of TTFG for the life of the program.

The government concludes its memorandum with a discussion of the Sixth Circuit's analysis in *United States v. Sosebee*, 419 F.3d 451 (6th Cir. 2005) (which we summarize, together with *United States v. Marino*, above). Contending that *Sosebee* provides helpful guidance here, the government explains:

> In this case, Borino was familiar with and involved in TTFG's recruitment and enrollment of victims under false pretenses. Borino was present at and involved in the formation and rollout of Classic 105. Doc. No. 103 at ¶ 28; *see also id.* at ¶ 29. . . . He was also involved at an executive level with TTFG, including directing marketing efforts, until the execution of federal search warrants in January 2017 effectively halted the enterprise. Even if he was independently unaware that Classic 105 was a fraud at some point—a dubious assertion—time and again, year after year, Borino was told so while the scheme was in progress. *See supra* at 4. Nevertheless, he persisted in furthering the narrative that Classic 105 was legitimate. *See id.* at ¶ 46. As in *Sosebee*, Borino's role at TTFG and involvement in marketing Classic 105 establish that, but for his continuing concealment of the fraud, victims' losses might have been avoided altogether or stemmed to a significant degree. *See Sosebee*, 419 F.3d at 459. Indeed, sufficient indicia exists to conclude that, but for Borino, Classic 105 may never have launched, much less enjoyed the tragic level of success that it did. Consequently, the Court should hold Borino responsible for the entire amount of loss to the victim employer-clients and employee-participants.

## C.

The transcripts of the November 1, 2022 sentencing hearing and the March 30, 2023 restitution hearing reveal the district court's obvious

familiarity with the case background, the pending issues, and the parties' arguments. Furthermore, they provide important information regarding the basis of and rationale for the district court's determination of Borino's offense conduct for purposes of sentencing and restitution. Specifically, they confirm that the district court did *not* order $21.5 million in restitution based solely on three conversations discussed in Borino's factual basis.

1.  November 1, 2022 Sentencing Hearing

Referencing the government's objection to the probation officer's initial determination of Borino's loss amount and corresponding guideline offense level, to which Borino had not responded, and confirming that Borino had no objection to the probation officer's resulting amendment of those aspects of the PSR, the court stated:

> [T]herefore, the government's objection, since it has been included in the addendum, I think is now moot because there's no objection by the defendant. To the extent it is not moot, the Court finds the addendum from the probation officer is correct.
>
> The Court determines that Mr. Borino is liable for the entire amount of the loss, jointly and severally with any co-conspirators, so that total loss being $25,543,340.70."

Relative to restitution, the district judge, later in the hearing, inquired regarding a determination of the victims' losses for purposes of ordering restitution and counsel for the government responded:

> [The Court:] [I]n order for to determine victims' losses, is it appropriate to set a hearing following this to determine the victims' losses?
>
> [Mr. Ginsberg]: "Your Honor, I would suggest that, as it relates, the Court found Mr. Borino to be jointly and severally responsible for the same amount [as Denis Joachim] for purposes of guideline loss calculations. I would anticipate

making an argument that the same would be appropriate as to restitution.

Additionally, in deciding Borino's sentence of imprisonment, the district court, having acknowledged receipt and review of both parties' sentencing memoranda, quoted several portions of the government's memorandum in order to ensure Borino's awareness of the government's assertions regarding his conduct and to provide him with an opportunity to respond. Then, after hearing Borino's and his counsel's remarks, the district court explained its decision to sentence Borino below the applicable guidelines range of 21 to 27 months imprisonment. Significantly, the court's remarks reveal close and careful consideration and assessment of information in the PSR, the parties' sentencing memoranda, and the government's exhibits relevant to the causation aspect of the restitution determination:

> In imposing the sentence, the Court has considered the statements here made today by Mr. Borino and his counsel, Mr. Borino's sealed sentencing memorandum, and the government's sealed opposition thereto.
>
> * * *
>
> In looking at the § 3553 factors, while I agree with you, Mr. Borino, that you have had a long career that appears to be mostly without blemish, the events that transpired with TFG in your significant role—not just turning a blind eye to what was going on, but your significant role as one of the primary advisors, the main person and head marketing person for TFG, shows me that you did more than turn a blind eye. You intentionally misled, duped, defrauded many, many individuals. So I find the nature and circumstances of the offense to be significant, the seriousness of the offense to be significant.
>
> To provide just punishment for the offense, I have taken into account the punishments received in the sentences

received by the Joachims and the third person, Mr. Silva, who was also inculpated in this scheme.

I agree with what's in the PSR report that Mr. Joachim was certainly the most culpable, but I do not believe that you are as culpable to the same extent as Mr. Silva, who did the taxes and financial matters for TFG.

In fact, I find that your history of being there for years and knowing in 2014 by the emails, knowing from 2014 on that this entity was based on nothing but fraud and yet continuing to market it and to get peoples' and entities' and companies' money for it, puts you somewhere similar to the Joachims, who—as indicated in the government's brief, you were Mr. Joachim's closest advisor and best friend.

I think it's very clear from the factual basis and the record before me that you were aware and part of this fraud from early on and an integral part of it. They couldn't have done the marketing. They couldn't have perpetuated the fraud that was perpetuated without your help.

* * *

Your sentence is in line with the sentence [imprisonment for twelve months and one day] received by Donna Joachim. I find that your actions are more fully aligned with her actions and it is appropriate to give a similar sentence.

* * *

I am imposing this sentence because I think it is appropriate solely based on the facts of the case before me that you pled guilty [sic] and what is appropriate and what is most in line with the co-conspirators in this case and looking at the § 3553 factors. I just want to make that clear.

Finally, as indicated, the Court orders full restitution to any victims of the defendant's crime.

[The Court:] Mr. Ginsberg, it was not entirely clear to me. Even though Mr. Borino is jointly and severally liable for

No. 22-30747

the full amount just as the Joachims are, they are having a restitution hearing?

[Mr. Ginsberg:] Yes, Your Honor.  On December 8.

[The Court:] Are you indicating that I should not hold one or I should?

[Mr. Ginsberg:] My suggestion, Your Honor, is that you schedule a restitution hearing for approximately 90 days with the hope that after the [Joachims'] restitution hearing and determination is made in that case, the parties may be able to reach a stipulation.

[The Court: ] All right. I will order a restitution hearing for February 13.

*See* Transcript of November 1, 2022 Sentencing Hearing.

2.  March 30, 2023 Restitution Hearing

Though most of the March 30, 2023 restitution hearing was directed to Borino's separate "no actual loss" argument, certain aspects of the court's comments address causation:

Your client marketed everything in this.  Your client was in the know from early on and also knew that it was a fraud from early on.

* * *

I've heard from the government. I've heard from the Defense on the amount of restitution due. The [g]overnment rests on the victims' losses in this case is the amount the employer clients and employee participants paid to TFG in fees. They have proven that amount paid. The burden then shifts to the defendant to prove that that amount is inaccurate or should be to a lesser amount.

Also important, the court appropriately limited the restitution order to the fees that the participants paid subsequent to the September 2014 date charged in Borino's bill of information, reasoning:

> [T]he one issue that remains on my mind is whether Mr. Borino should be jointly and severally liable for the full amount of the money paid into the program or only for the time period as he's charged in the superseding bill of information.
>
> Since I have not heard anything on that, I do think it is appropriate to reduce the restitution amount to the time period as set forth in the superseding bill of information, and that time period is from September 2014 continuing through or at least to January 10, 2017.
>
> With that said, I find that Mr. Borino is jointly and severally liable for that amount of restitution owed to the victims for their losses, and that amount will be $21,223,036.37.

*See* Transcript of March 30, 2023 Restitution Hearing.

## D.

On this record, no reasonable argument can be made that the district court, in determining Borino's restitution award, considered *only* three conversations (from the factual basis) that Borino seeks to convince us constitute the entirety of the conduct underlying his misprision offense. To the contrary, it is apparent from the record that the district court adopted the government's delineation of Borino's offense conduct, and conducted a causation analysis consistent with that employed in *Sosebee* and *Marino*. The transcripts from the sentencing and restitution hearings, when considered together with the other materials then before the court, preclude any other determination.

We see no error, much less plain error, on the record before us. The parameters of Borino's restitution obligation are determined by the conduct

underlying his offense of conviction. Though his offense is misprision, the felony concealed is wire fraud. And wire fraud includes, by definition, a fraudulent scheme, not a single act or multiple unrelated acts of fraud. Thus, the structure of the TTFG's program—the fraudulent scheme—is appropriately considered.

What's more, during the relevant, multi-year time period after which he admittedly knew that TTFG's program did not have the funding structure that it claimed to have, Borino was presented with numerous expressions of concern and inquiries about the validity of TTFG's program that he simply deflected. Like the defendant in *Marino*, Borino was one of the individuals who knew of and was in a position to have revealed the fraud, but did not. And like in *Sosebee*, but for his continuing concealment, significant losses might have been avoided altogether or at least stemmed to a significant degree. Given his position atop a downward flowing information stream, Borino's continued failure to "come clean" kept the marketing program going such that he appropriately bears restitution responsibility for the entirety of the losses that logically and foreseeably followed. In a nutshell, the record provides the requisite evidentiary support for the $21,223,036.37 million that Borino was ordered to pay as restitution.

## VI. CONCLUSION

For the reasons stated, Borino's challenges to the validity of the district court's restitution order lack merit. Accordingly, we AFFIRM.